IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 4, 2017 Session

**STATE OF TENNESSEE v. CHAD E. HENRY**

**Appeal from the Circuit Court for Chester County**
No. 16-CR-14          Kyle Atkins, Judge
_____

**No. W2016-01439-CCA-R9-CD**
_____

We granted this interlocutory appeal to review the trial court's suppression of the results of a mandatory blood draw from the Defendant, Chad E. Henry, conducted pursuant to Tennessee Code Annotated section 55-10-406(d)(5) (Supp. 2014) (also referred to herein as the mandatory blood draw provision for individuals with a prior conviction for driving under the influence) of the implied consent statute. Henry was arrested and a mandatory blood draw was conducted without a warrant after his car struck the rear of another car. Henry was subsequently indicted by the Chester County Circuit Court for one count of driving under the influence (DUI), one count of third offense DUI, one count of violating the financial responsibility law, and one count of aggravated assault. Following his indictment, Henry moved to suppress the results from the mandatory blood draw, asserting that the warrantless blood test violated his constitutional rights to be free from unreasonable searches and seizures. After a hearing, the trial court granted the motion to suppress, holding that the blood draw was illegal because the officers failed to advise Henry, pursuant to Code section 55-10-406(c) (Supp. 2014), that his refusal to submit to the test would result in the suspension of his driver's license. The State filed a motion for an interlocutory appeal challenging the suppression of the evidence, which the trial court granted, and this court granted the State's application for a Rule 9 appeal. In this appeal, the State argues (1) Henry's implied consent to blood testing, by virtue of Tennessee's implied consent statute, operates as an exception to the warrant requirement, (2) the good-faith exception to the exclusionary rule, as outlined in State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016), applies in this case because the officers acted pursuant to the binding authority of State v. Humphreys, 70 S.W.3d 752 (Tenn. 2001), and the implied consent statute when they required Henry to submit to a warrantless blood test, and (3) motorists with prior DUI convictions, like Henry, have a reduced expectation of privacy under the Fourth Amendment when arrested for a subsequent DUI.[1]  Because no

---

[1] After permission to appeal was granted but before oral argument took place in this case, the Tennessee Supreme Court filed its opinion in State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016), adopting the good-faith exception to the exclusionary rule as articulated in Davis v. United States, 564 U.S. 229 (2011), and holding that although the warrantless blood draw violated the defendant's right to be free

exception to the warrant requirement justifies the warrantless blood draw in this case and because the good-faith exception does not apply, we affirm the trial court's suppression of the evidence.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Jerry Woodall, District Attorney General; and Christopher Post, Assistant District Attorney General, for the Appellant, State of Tennessee.

Michael L. Weinman, Jackson, Tennessee, for the Defendant-Appellee, Chad E. Henry.

**OPINION**

On March 18, 2015, Henry was traveling west on Main Street in Henderson, Tennessee, when his car struck the rear of another car. The responding officers, after noting that Henry had signs of impairment, required him to perform several field sobriety tests. The officers also determined that Henry had prior convictions for DUI after dispatch checked his driver's license. Following Henry's unsatisfactory performance on the field sobriety tests, the officers determined that there was probable cause to believe that Henry had been driving under the influence of an intoxicant, and they arrested him. At that point, one of the officers informed Henry that his prior DUI convictions made a blood test mandatory and transported him to a nearby medical clinic for a mandatory blood draw. Later, Henry moved to suppress the results of the blood test, arguing that it violated his rights against unreasonable searches and seizures. The State responded, asserting that the officers informed Henry he was subject to a mandatory blood draw because of his prior DUI convictions, that Henry had consented, by virtue of the implied consent statute, to the mandatory blood draw by exercising the privilege of operating a motor vehicle on the roadways in Tennessee, and that Henry had never withdrawn or revoked his implied consent after being informed of the mandatory blood draw.

At the suppression hearing, Sergeant Jason Rhodes of the Henderson Police Department testified that on March 18, 2015, he was sent to the scene of a car accident involving injuries on East Main Street. He said that he traveled in a marked patrol car to

---

from unreasonable searches and seizures, the evidence from the blood draw was nevertheless admissible because it was obtained in objectively reasonable good-faith reliance on binding precedent, which established the rule that the natural dissipation of alcohol within the bloodstream presented an exigent circumstance justifying a warrantless blood draw in every drunk driving case.

the accident and that the other two officers at the scene, Officer Kyle Carter and Officer Michael Rhodes, arrived in separate patrol car. Upon arriving at the scene, Sergeant Rhodes determined that Henry was at fault for the car accident that resulted in injuries to Audrey Kerr, the driver of the other car. Although he acknowledged stating in his police report that Kerr had not been injured in the accident, Sergeant Rhodes said Kerr told him at the scene that she had been hurt in the accident but did not wish to be transported in an ambulance to the hospital.

When Sergeant Rhodes asked Henry what happened to cause the accident, Henry said that "he had blacked out and couldn't recall." Sergeant Rhodes then asked Henry if he had consumed any alcohol or drugs, and Henry replied that the only thing he had consumed was a prescription painkiller. After noticing that Henry was unsteady on his feet, was restless, and had slurred speech, Sergeant Rhodes had Henry perform several field sobriety tests. These tests included asking Henry to "say his alphabet," requiring him to complete "the fingertip to the tip of the nose" test, and asking Henry "to count backwards from 68 to 52." Sergeant Rhodes said Officer Kyle Carter gave the horizontal gaze nystagmus test to Henry. When Henry performed unsatisfactorily on each of these tests, Sergeant Rhodes arrested him. A short time later, Sergeant Rhodes heard Officer Michael Rhodes[2] inform Henry that he was going to take him to get his blood drawn because it was mandatory. Although Sergeant Rhodes could not remember whether Henry made a statement in response, he stated that Henry was "calm" and "matter of fact" about the blood draw and was "okay with it." He added, "[Henry] never said no, yes [to the blood draw], that I can recall." Sergeant Rhodes said Henry never told him or Officer Rhodes that he would not give his blood or that they were not going to take his blood. He also said Henry never expressly withdrew or revoked any implied consent to take his blood.

Sergeant Rhodes said it was his opinion that this was a mandatory blood draw situation because: (1) Henry appeared to be under the influence of an intoxicant and had previously been convicted of a DUI, and (2) Henry appeared to be under the influence of an intoxicant and had just been involved in an accident resulting in injuries to another party. Sergeant Rhodes said he determined that the instant offense was a multiple offense DUI after he had dispatch check Henry's driver's license. He recalled that at the time of the accident, Henry had been convicted of at least one DUI in Pennsylvania in 2012.

Sergeant Rhodes did not tell Henry that he had the right to refuse the blood draw, and he did not hear any other officer tell Henry that he had a right to refuse the blood draw. He also said that neither he nor any other officer advised Henry that his refusal to

---

[2] Because these two police officers share the same surname, we will distinguish them by referring to Sergeant Jason Rhodes as "Sergeant Rhodes" and to Officer Michael Rhodes as "Officer Rhodes."

- 3 -

submit to the test would result in the suspension of his driver's license. Sergeant Rhodes said that his police department regularly used an Implied Consent Form, which is read to the suspect and gives the suspect the opportunity "to decline or affirm with a blood draw or a breathalyzer test." He stated that the Implied Consent Form was not used in Henry's case because of a "miscommunication." Sergeant Rhodes said he believed Officer Rhodes had read and completed the form with Henry while Officer Rhodes believed that Sergeant Rhodes had read and completed the form with Henry, but neither officer actually did so. Sergeant Rhodes also stated that neither he nor the other officers obtained a search warrant to take Henry's blood. When asked when a search warrant is required in this situation, Sergeant Rhodes replied,

> Mr. Henry would be read the implied consent [form]. If Mr. Henry had consented to the—consented to the blood draw, his blood would have been drawn.

> If he had declined [the blood draw,] I would have drawn an affidavit . . . and a warrant for his blood and . . . continued to a judge . . . to ask for that to be signed.

Sergeant Rhodes admitted that this procedure was not followed in Henry's case. Nevertheless, he said that if Henry had refused the blood draw, he would have sought a warrant to obtain Henry's blood. Sergeant Rhodes said he understood the law to be that even in the case of a mandatory blood draw pursuant to the statute, Henry had the right to be asked if he was consenting to the blood test. He also said Henry had the right to refuse the blood test, and if he refused it, then the officer was supposed to get a warrant for the blood draw.

Officer Michael Rhodes of the Henderson Police Department testified that on March 18, 2015, at around 4:00 p.m., he responded to a call involving a two-car accident with possible injuries in the area of East Main Street. Officer Rhodes arrived at the scene in a marked patrol car, and the other two officers at the scene, Officer Kyle Carter and Sergeant Jason Rhodes, arrived in their own cars. Officer Rhodes stated that he assisted Sergeant Rhodes with the accident, and when he made contact with Henry, he noticed that Henry "seemed unsteady on his feet" and "jittery." Officer Rhodes stated that although he was in the vicinity when Sergeant Rhodes was giving Henry the field sobriety tests, he did not closely observe these tests because he was obtaining the information from Henry's car. He acknowledged that Henry was arrested after Sergeant Rhodes gave him the field sobriety tests. Officer Rhodes said that Sergeant Rhodes asked dispatch to check Henry's driver's license, and once they realized that Henry had prior DUI convictions, they discussed the fact that this qualified as a mandatory blood draw under the statute. Officer Rhodes said he and Sergeant Rhodes also believed that

- 4 -

Kerr, the driver of the other car, was injured, even though she was not transported to the hospital by ambulance, because Kerr told them at the scene that she had injured her neck or back in the accident. He maintained that he and Sergeant Rhodes never based the mandatory blood draw solely on Henry's prior DUI convictions.

After Henry was arrested, Officer Rhodes informed him that he was going to transport him to a nearby clinic, just a quarter of the mile up the street from the accident, "for a mandatory blood draw" because Henry had been convicted of "prior DUI[']s." He said Henry responded, "Okay," and had a calm demeanor. When asked if he believed Henry's "okay" response was consent to the blood draw, Officer Rhodes replied, "I don't know if he was consenting or if he was just letting me know, "Okay. I understand what you're saying." Officer Rhodes admitted that Henry never specifically consented to having his blood tested.

Officer Rhodes acknowledged that he never read the Tennessee Implied Consent Form to Henry because he and the other officers did not have one with them at the time. When asked if he normally reads the Implied Consent Form when he arrests an individual for DUI and is going to give a test to determine if the person is under the influence of drugs or alcohol, Officer Rhodes responded:

> We normally try to read the Implied Consent Form. We [were] very busy that day and I guess we assumed one of—There [were] three of us working the case and I guess we all assumed that the other one was going to do it. I—I can't answer that. I don't know. It was just overlooked.

Officer Rhodes stated that Henry never told him that he did not want to give his blood or that the officers were not going to take his blood. He added that Henry "never tried to refuse" the blood draw and never expressly withdrew any implied consent to take his blood.

Officer Rhodes also stated that as he was transporting Henry to the clinic and while they were at the clinic, Henry never expressly told him that he did not want to consent to give his blood. He said that as the nurse was drawing his blood, Henry remained calm and never said he did not want his blood taken.

Officer Rhodes said he did not tell Henry he had the right to refuse the test and did not hear any other officer advise him of this right of refusal. In addition, Officer Rhodes said he did not inform Henry that his refusal to submit to the blood draw would result in the suspension of his driver's license, and he did not hear any other officer advise Henry of this consequence of refusal. Officer Rhodes agreed that no warrant was ever obtained

to draw Henry's blood. He claimed that if Henry had refused the blood draw, he would have sought a warrant to draw his blood.

At the conclusion of the proof, the State argued that the court should deny the motion to suppress on the basis that (1) Henry impliedly consented to the blood draw the moment he operated a vehicle on a Tennessee roadway, see Humphreys, 70 S.W.3d at 761; (2) Henry never expressly revoked or withdrew this implied consent to give blood, see id.; (3) the officer did not make a baseless threat when he informed Henry that the blood draw was mandatory, even if the officer had to obtain a warrant if Henry had refused, see State v. Patrick Lee Mitchell, No. M2014-01129-CCA-R3-CD, 2015 WL 2453095, at *4 (Tenn. Crim. App. May 22, 2015); and (4) it was unnecessary to have the Implied Consent Form read or signed by Henry if he never expressly revoked or withdrew his implied consent because the State was not prosecuting him for a violation of the implied consent law, see State v. Shirley Larhonda Gagne, No. E2009-02412-CCA-R3-CD, 2011 WL 2135105, at *9 (Tenn. Crim. App. May 31, 2011).

Defense counsel responded that the real issue was whether the officers had properly advised Henry, although he also sought to preserve the issue of whether the implied consent statute is an exception to the warrant requirement. He noted that Code sections 55-10-406(d)(5)(A), (B), which govern mandatory blood draws for individuals with prior DUI convictions and for drivers involved in accidents involving injury or death of another, require that "[t]he test shall be performed in accordance with the procedure set forth in this section[.]" Moreover, he said that Code section 55-10-406(c) states that an officer, "shall, prior to conducting either test or tests, advise the driver that refusal to submit to the test or tests will result in the suspension by the court of the driver's operator's license." Defense counsel, noting the State had conceded that Henry was told only that the blood test was mandatory, then asserted, "Our position under this statute is . . . that whether or not you use the exact language of the Implied Consent Form, whether or not you have [the motorist] sign an Implied Consent Form, whatever means are used to convey that information to the Defendant, to the driver, you've got to say: 'If you refuse the test, you're going to lose your driver's license'" because this "put[s] the driver on notice that [he] can refuse the test." While defense counsel admitted that he had not presented any proof that Henry withdrew or revoked his consent, he asserted that the officers in this case had failed to comply with the statute, which rendered the blood draw invalid and required the suppression of the test results.

After hearing arguments from the parties, the trial court said it found Sergeant Rhodes and Officer Rhodes to be "credible witnesses" who had been "very candid" about what occurred in the case. The court then granted the suppression motion, stating:

If you look at 55-10-406, it does say that a driver of a motor vehicle in this state is deemed to have given consent to test or tests for determining drug and alcohol content.

But I think you then have to go look at Section ([55-10-406(c)], which says that prior to conducting either test the law enforcement officer shall advise the driver that he has the right to refuse the test. And that, I think, is critical. And that candidly both officers indicated they didn't tell him that, that they told him that it was a mandatory test.

I think that's a distinction from the [State v. A.D.] Smith[, No. W2015-00133-CCA-R9-CD, 2015 WL 9177646 (Tenn. Crim. App. Dec. 15, 2015) perm. app. denied (Tenn. Nov. 22, 2016),] case. In the Smith case the officer testified that he went over the Implied Consent Form with him and that he just had a clerical error in forgetting to get him to sign it and mark in the correct box.

But at the end of the day it's an invasion of a person under the Fourth Amendment without a warrant.

So because of that, I'm going to . . . grant the Motion to Suppress the testing.

On May 2, 2016, the trial court entered an order suppressing the results of Henry's blood alcohol test, which stated in pertinent part:

1. The Court makes the following findings of fact: [Henry] was arrested by officers of the Henderson, Tennessee Police Department for DUI on March 18, 2015. At the hearing the officers testified that they believed that a mandatory blood draw was required under TCA §55-10-406(d)(5)(B). The evidence presented at the hearing established that the officers did not obtain a search warrant for the blood draw. At the hearing the arresting officers admitted that they did not have [Henry] sign the Implied Consent Form that they usually use when administering blood tests to individuals suspected of DUI, nor did they read it to him. The officers admitted that they did not advise [Henry] he could refuse to have his blood drawn or that refusal to submit to the test would result in the suspension by the court of his operator's license. The officers caused [Henry's] blood to be drawn.

2.    The Court finds that TCA §55-10-406(d)(5)(B) required the officers to comply with procedures set for[th] in TCA § 55-10-406(c) and that the officers' failure to advise [Henry] that "refusal to submit to the test or test[s] will result in the suspension by the court of the driver's operator's license" as required by the statute, rendered the blood test illegal under the statute.  Accordingly, this court grants [Henry's] Motion to Suppress any evidence related to the results of the blood tests performed on the Defendant.

It is therefore, Ordered, Adjudged and Decreed that any evidence related to the results of the blood tests performed on [Henry] is hereby suppressed.

The State subsequently filed a motion for permission to file an interlocutory appeal from the trial court's order and to stay further proceedings in this case, which the trial court granted.  The State then filed a timely application for an interlocutory appeal, which this court granted.

## ANALYSIS

The State argues that the trial court erred in granting the motion to suppress because the officers' failure to advise Henry of the implied consent statute's refusal provision does not affect the constitutional and statutory bases for performing a warrantless blood draw.  First, the State contends that because Henry consented to the blood draw, by virtue of the implied consent statute, and never withdrew or revoked his consent, a warrant was unnecessary.  Second, the State argues that even if Henry's implied consent did not justify the search, the trial court should not have suppressed the proof from the blood draw because the officers acted in "objectively reasonable good faith reliance" on State v. Humphreys and Tennessee's implied consent law.  Third, the State contends that motorists with prior DUI convictions, like Henry, have a reduced expectation of privacy under the Fourth Amendment when arrested for a subsequent DUI, making a warrantless blood draw reasonable.

Henry responds that the trial court properly granted his motion to suppress the results of the blood alcohol test.  He asserts he was never advised that his refusal to submit to the test or tests would result in the suspension of his driver's license, as required by the implied consent law.  Henry also claims that "consent" pursuant to the implied consent statute is "not constitutionally-valid consent to search, but rather consent to certain consequences should permission to search be withheld" and that interpreting the implied consent statute as authorizing a warrantless blood draw in the absence of voluntary consent violates the state and federal constitutions.  Finally, he maintains that

- 8 -

the good-faith exception adopted in Reynolds is inapplicable because the law regarding the implied consent law was unsettled at the time of his mandatory blood draw.

Initially, we note that a trial court's findings of fact at a suppression hearing are binding on an appellate court unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. at 23; see Bell, 429 S.W.3d at 529. Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008) (citing State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. It is well established that Article 1, section 7 is identical in intent and purpose to the Fourth Amendment. Reynolds, 504 S.W.3d at 312-13; State v. McCormick, 494 S.W.3d 673, 683-84 (Tenn. 2016). In determining whether a search or seizure has violated constitutional protections, we recognize that "[r]easonableness is the 'touchstone of the Fourth Amendment.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010); see Reynolds, 504 S.W.3d at 304. "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). The reasonableness of a search may be determined by evaluating the degree to which it intrudes on an individual's privacy with the degree to which it is needed for the promotion of a legitimate public interest. Birchfield v. North Dakota, 136 S. Ct. 2160, 2176 (2016); State v. Davis, 191 S.W.3d 118, 120 (Tenn. Crim. App. 2006). The Fourth Amendment "deems reasonable those searches conducted pursuant to a warrant issued 'upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006) (quoting U.S. Const. amend. IV).

A warrant must generally be obtained because warrants protect against unreasonable searches. Kentucky v. King, 563 U.S. 452, 459 (2011); see Birchfield, 136 S. Ct. at 2181 (noting that warrants not only "ensure that a search is not carried out unless

a neutral magistrate makes an independent determination that there is probable cause to believe that evidence will be found" but also "limit[] the intrusion on privacy by specifying the scope of the search—that is, the area that can be searched and the items that can be sought"); State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) ("[A]s a general matter, law enforcement officials cannot conduct a search without having first obtained a valid warrant."). A warrantless search or seizure is presumed unreasonable and evidence obtained as a result will be suppressed "unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). The generally recognized exceptions to the warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005).

It is well established that the taking of a blood sample is a search. Birchfield, 136 S. Ct. at 2173; Schmerber v. California, 384 U.S. 757, 767-68 (1966); Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013); Scarborough, 201 S.W.3d at 616. "[T]he physical intrusion occasioned by a blood draw 'infringes an expectation of privacy' and '"[t]he ensuing chemical analysis of the sample . . . is a further invasion of the tested [individual's] privacy interests.'" Scarborough, 201 S.W.3d at 616 (quoting Skinner v. Ry. Labor Executives' Assn., 489 U.S. at 616); see also McNeely, 133 S. Ct. at 1558 ("Such an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." (internal quotations marks omitted)); Birchfield, 136 S. Ct. at 2178 (stating that "a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading" and that "[e]ven if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested"). An accused's blood cannot be taken or analyzed unless the search is reasonable pursuant to the Fourth Amendment. Birchfield, 136 S. Ct. at 2173; see Schmerber, 384 U.S. at 767. Therefore, we must consider whether the taking of Henry's blood without a warrant was justified by an exception to the warrant requirement.

**I.** **Implied Consent as Exception to the Warrant Requirement.** The State argues that implied consent to testing, by virtue of Tennessee's implied consent statute, operates as an exception to the warrant requirement. In considering this issue, we must first consider the impact of the United States Supreme Court case of Birchfield v. North Dakota, 136 S. Ct. 2160 (2016), before evaluating whether "implied consent" justifies a warrantless search under the United States Constitution and the Tennessee Constitution. We believe Birchfield deserves in-depth consideration because its holding makes it clear that a driver's "implied consent" to testing cannot justify a warrantless blood test.

- 10 -

Birchfield also challenges the continued vitality of implied consent statutes that create a per se exception to the warrant requirement because a breath test may now be given every time an individual is arrested for a drunk driving offense.

**A. The Impact of Birchfield.** Neither the State nor Henry references Birchfield. While we recognize that Birchfield primarily focused on motorists who had been convicted of a crime by refusing to take a warrantless blood or breath test to determine the alcohol content of their blood, we nevertheless conclude that this opinion directly impacts Henry's case. Accordingly, we will fully evaluate the United States Supreme Court's decision in this case.

In Birchfield, the Court considered "whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream." 136 S. Ct. at 2172. In contemplating this issue, the Court recognized that a State may criminalize the refusal to comply with such a test as long as the warrantless test comports with the protections of the Fourth Amendment:

> [S]uccess for all three petitioners depends on the proposition that the criminal law ordinarily may not compel a motorist to submit to the taking of a blood sample or to a breath test unless a warrant authorizing such testing is issued by a magistrate. If, on the other hand, such warrantless searches comport with the Fourth Amendment, it follows that a State may criminalize the refusal to comply with a demand to submit to the required testing, just as a State may make it a crime for a person to obstruct the execution of a valid search warrant.

Id. at 2172. After noting that the petitioners in the three cases before it were searched or were informed that they were required to submit to a search after being arrested for drunk driving, the Court considered "how the search-incident-to-arrest doctrine applies to breath and blood tests incident to such arrests." Id. at 2174.

The Court first examined the degree to which breath and blood tests intrude upon a person's privacy and the degree to which such tests are needed to promote legitimate government interests. Id. at 2176 (citing Riley v. California, 134 S. Ct. 2473, 2484 (2014). It concluded that breath tests do not "implicat[e] significant privacy concerns" because the physical intrusion to the body is minimal, because breath tests reveal only the amount of alcohol on the driver's breath and not other, more personal information, and because submitting to a breath test is not "likely to cause any great enhancement in the embarrassment that is inherent in any arrest." Id. at 2176-77 (internal quotations omitted). However, the Court held that blood tests substantially impact an individual's

- 11 -

privacy interests because they require a physical intrusion into the body and an extraction of a portion of the subject's body.  Id. at 2178.  The Court also recognized that "a blood test, unlike a breath test, places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading."  Id.  It added that "[e]ven if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested."  Id.  When assessing the degree to which such tests promote legitimate government interests, the Court recognized that "'[t]he States and the Federal Government have a "paramount interest . . . in preserving the safety of . . . public highways.'"  Id. (quoting Mackey v. Montrym, 443 U.S. 1, 17 (1979)).

After evaluating the impact of blood alcohol tests on privacy interests and the need for such tests, the Birchfield Court held that "a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving" and that "[a]s in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation."  Id. at 2185.  In reaching this holding, the Court stated that "[b]lood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test."  Id. at 2184.

In applying this reasoning to the three petitioners in Birchfield, the Court held:

> Petitioner Birchfield was criminally prosecuted for refusing a warrantless blood draw, and therefore the search he refused cannot be justified as a search incident to his arrest or on the basis of implied consent. There is no indication in the record or briefing that a breath test would have failed to satisfy the State's interests in acquiring evidence to enforce its drunk-driving laws against Birchfield.  And North Dakota has not presented any case-specific information to suggest that the exigent circumstances exception would have justified a warrantless search.  Cf. McNeely, 569 U.S., at ——, 133 S. Ct., at 1567.  Unable to see any other basis on which to justify a warrantless test of Birchfield's blood, we conclude that Birchfield was threatened with an unlawful search and that the judgment affirming his conviction must be reversed.

> Bernard, on the other hand, was criminally prosecuted for refusing a warrantless breath test.  That test was a permissible search incident to Bernard's arrest for drunk driving, an arrest whose legality Bernard has not contested.  Accordingly, the Fourth Amendment did not require officers to obtain a warrant prior to demanding the test, and Bernard had no right to refuse it.

Unlike the other petitioners, Beylund was not prosecuted for refusing a test. He submitted to a blood test after police told him that the law required his submission, and his license was then suspended and he was fined in an administrative proceeding. The North Dakota Supreme Court held that Beylund's consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests. Because voluntariness of consent to a search must be "determined from the totality of all the circumstances," Schneckloth, supra, at 227, 93 S. Ct. 2041[,] we leave it to the state court on remand to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory.

Id. at 2186 (emphases added).

The Birchfield Court emphasized that when a blood test is necessary, as it may have been in Henry's case, "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not." Id. at 2184. Significantly, the Court did not mention the possibility of obtaining an individual's voluntary consent to a blood test, which reveals both a preference for a warrant or legitimate exigent circumstances in these situations and a recognition that individuals who drive while impaired are unlikely to have the capacity to voluntarily consent to a blood test. Moreover, when considering whether to affirm or reverse the judgment upholding petitioner Birchfield's criminal conviction for refusing a warrantless blood draw, the Court made it abundantly clear that "the search [Birchfield] refused cannot be justified as a search incident to this arrest or on the basis of implied consent." Id. at 2186 (emphasis added). It then concluded that Birchfield had been "threatened with an unlawful search" and reversed the judgment affirming his conviction. Id. When the Court considered petitioner Beylund's fate, it recognized that Beylund submitted to the blood test after the officer informed him that the law required his submission. After noting that the North Dakota Supreme Court held that Beylund's consent was voluntary after it erroneously assumed that "the State could permissibly compel both blood and breath tests," the Court reiterated that "voluntariness of consent to a search must be 'determined from the totality of all the circumstances'" and remanded the case "to reevaluate Beylund's consent given the partial inaccuracy of the officer's advisory." Id.

Given the Court's reasoning in Birchfield, we can confidently conclude that Henry's warrantless blood draw pursuant to the mandatory blood draw section of the statute was not justified based on his legally implied consent. Moreover, because a breath test may now be given every time an individual is arrested for a drunk driving

- 13 -

offense, the need for a constitutionally infirm "implied consent" justification for warrantless breath tests becomes unnecessary.[3]

**B. Implied Consent As An Exception to the Warrant Requirement.** The State argues that because Henry impliedly consented to the blood draw pursuant to Tennessee's implied consent statute and never withdrew or revoked it, his consent satisfies the consent exception to the warrant requirement. While the State concedes that Henry was not informed of his ability to refuse the blood test, it asserts that this omission does not affect the admissibility of the results from the blood draw. The State also maintains that because Henry had prior DUI convictions, he relinquished his right to refuse a mandatory blood test unless he withdrew or revoked his implied consent. In resolving these issues, we must determine whether implied consent under the statute qualifies as consent under the Fourth Amendment.

The version of Tennessee Code Annotated section 55-10-406 that was in effect at the time of this incident provided, in pertinent part:

> Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.

T.C.A. § 55-10-406(a)(1) (Supp. 2014) (amended July 1, 2016, and July 1, 2017). This statute allows law enforcement officers to test a motorist's blood only when they have "reasonable grounds to believe" that the motorist was driving while under the influence or had committed vehicular assault, vehicular homicide as a proximate result of the

---

[3] Under the amended version of Tennessee's implied consent law that became effective July 1, 2017, a motorist is deemed to have given implied consent to a breath test for determining the alcohol content of the motorist's blood if an officer has probable cause to believe the motorist violated one of the designated offenses related to impaired driving. See T.C.A. § 55-10-406(d)(1) (Supp. 2017). However, Birchfield makes it clear that if an officer has probable cause to believe that the motorist was driving while impaired, then the officer may simply arrest the motorist for that offense and conduct a breath test pursuant to the search-incident-to-arrest exception to the warrant requirement. Because Birchfield legitimizes breath tests incident to arrest upon this same probable cause determination, the need for a constitutionally infirm "implied consent" justification for warrantless breath tests becomes unnecessary.

driver's intoxication, or aggravated vehicular homicide as a proximate result of intoxication. Id. The term "reasonable grounds" in Code section 55-10-406 has been interpreted to mean "probable cause." See Reynolds, 504 S.W.3d at 295 n.11 ("The term "reasonable grounds" is not statutorily defined, but Tennessee courts have equated it with "probable cause" and have used the terms interchangeably."); State v. Bowery, 189 S.W.3d 240, 248 (Tenn. Crim. App. 2004).

Code section 55-10-406 required that before conducting a test or tests for the purpose of determining the alcohol or drug content, or both, of the motorist's blood, law enforcement must advise the motorist that refusal to submit to the test or tests will result in the suspension of the motorist's driver's license and may result in other enumerated consequences. T.C.A. § 55-10-406(c). If the motorist refuses to submit to the test or tests, he will be charged with violating the implied consent law so long as the motorist was advised of the consequences of refusal. Id. § 55-10-406(d)(1). However, Code section 55-10-406(d)(5) provides for a mandatory blood draw in certain circumstances, including the following that are relevant to Henry's case:

> (A) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle involved in an accident resulting in the injury or death of another has committed a violation of § 39-13-213(a)(2), § 39-13-218, or § 55-10-401, the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test; or
>
> (B) If a law enforcement officer has probable cause to believe that the driver of a motor vehicle has committed a violation of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401, and has a prior conviction of § 39-13-213(a)(2), § 39-13-218 or § 55-10-401, the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

Id. § 55-10-406(d)(5)(A), (B).

In McNeely, 133 S. Ct. at 1556, the United States Supreme Court held that the natural dissipation of alcohol in the blood does not create "a per se exigency" justifying an exception to the warrant requirement and that "consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case

- 15 -

based on the totality of the circumstances." The Court emphasized, "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561 (citing McDonald v. United States, 335 U.S. 451, 456 (1948) ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative.")).

Shortly thereafter, in State v. James Dean Wells, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014), this court held that while the implied consent statute serves as a tool the State may use to persuade the accused to submit to a blood or breath test, it does not create consent under the Fourth Amendment:

> While the State may attempt to persuade the accused to submit to a search by providing consequences for a failure to submit to a test ordered upon probable cause, we hold that the privilege of driving does not alone create consent for a forcible blood draw. Given the gravity of the intrusion into privacy inherent in a forcible blood draw, we conclude that such a search is not reasonable unless performed pursuant to a warrant or an exception to the warrant requirement. The implied consent law does not, in itself, create such an exception.
>
> . . . .
>
> This is not, of course, to say that the State cannot obtain a blood sample from the accused in contravention of his or her wishes. We merely conclude that such a sample must be taken in compliance with the Fourth Amendment—that is, it must be supported by a warrant issued by an independent magistrate finding probable cause or by exigent circumstances, voluntary consent, or some other exception to the warrant requirement. The implied consent law does not, in itself, satisfy any of these exceptions in the context of a forcible blood draw.

James Dean Wells, 2014 WL 4977356, at *13 (footnote omitted); see State v. Charles A. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *12 (Tenn. Crim. App. Oct. 3, 2014) ("[W]e conclude that the legislature did not intend for Code section 55-10-406(f)(2) to operate as a blanket exception to the warrant requirement."). The court stressed that the implied consent law does not create a per se exception to the warrant requirement for the purposes of the Fourth Amendment. James Dean Wells, 2014 WL 4977356, at *14 ("The State cannot, through legislation, strip an accused of constitutional rights.").

- 16 -

Even more recently, the Tennessee Supreme Court in Reynolds, 504 S.W.3d at 288, considered whether warrantless blood draws violate a defendant's right to be free from unreasonable searches and seizures. In that case, the defendant was involved in a single-car accident that killed two of the three individuals in her vehicle. Id. at 289. After speaking with the survivors of the accident, a deputy determined that the defendant was driving the car at the time of the accident. Id. Believing that the defendant had verbally consented to the blood draw at the hospital, the deputy did not obtain a warrant and did not advise the defendant that she could refuse the blood draw or of the legal consequences of refusal before asking medical staff to obtain a sample of the defendant's blood. Id. The Tennessee Supreme Court held that the warrantless blood draw violated the defendant's right to be free from unreasonable searches and seizures because the record failed to establish that the defendant had the capacity to revoke her statutory implied consent. Id. at 309. However, after adopting the good-faith exception to the exclusionary rule as articulated in Davis v. United States, 564 U.S. 229 (2011), the court held that the test results were nevertheless admissible because they were obtained in objectively reasonable good-faith reliance on binding precedent that exigent circumstances justified a warrantless blood draw in every drunk driving case. Reynolds, 504 S.W.3d at 314. In reaching this conclusion, the court specifically "decline[d] to determine . . . whether the implied consent statute satisfies the consent exception to the warrant requirement or whether the implied consent statute violates the federal or state constitution by authorizing warrantless blood draws." Id. at 308.

We note that prior to McNeely, James Dean Wells, and Reynolds, most Tennessee decisions relied on the existence of exigent circumstances to justify warrantless blood tests, including many that concluded that such testing was a per se exigency in every drunk driving case. See, e.g., Humphreys, 70 S.W.3d at 760-61 ("Based upon the fact that evidence of blood alcohol content begins to diminish shortly after drinking stops, a compulsory breath or blood test, taken with or without the consent of the donor, falls within the exigent circumstances exception to the warrant requirement."); State v. James Stacey Carroll, No. W2001-01464-CCA-R3-CD, 2002 WL 184627, at *5 (Tenn. Crim. App. Aug. 9, 2002) (same); State v. Michael A. Janosky, No. M1999-02574-CCA-R3-CD, 2000 WL 1449367, at *4 (Tenn. Crim. App. Sept. 29, 2000) ("[A] warrantless test of an individual's bodily substances does not violate any constitutional right so long as the search was supported by probable cause, the evidence was of an evanescent nature, and the means and procedures employed in taking the substance were reasonable."); State v. Fowler, No. 4, 1985 WL 3545, at *3 (Tenn. Crim. App., at Jackson, Nov. 6, 1985) ("[e]xigent circumstances will generally always exist because the nature of alcohol is such that it will soon disappear from a person's blood stream"). As a result, the issue of whether implied consent satisfies the consent exception to the warrant requirement has never been fully developed in our case law.

- 17 -

We recognize that in Humphreys, this court stated, "In addition to the exigent circumstances established by the nature of the evidence in cases involving intoxicated motorists, the statutorily created implied consent of the motorist permits the warrantless search of the motorist's breath or blood." Humphreys, 70 S.W.3d at 761 (citing Michael A. Janosky, 2000 WL 1449367, at *4). Humphreys concluded that pursuant to Code section 55-10-406, "anyone who exercises the privilege of operating a motor vehicle in this state has consented in advance to submit to a breath alcohol test," making a warrant unnecessary. Id. The court added that "if probable cause exists to believe that (1) the suspect motorist has consumed intoxicating liquor and (2) evidence of the motorist's intoxication will be found if the blood is tested, . . . it is unnecessary for law enforcement officers to obtain the voluntary consent of an individual motorist before administering a breath test for alcohol concentration level." Id.

Other panels of this court have made similar holdings. See State v. Darryl Alan Walker, No. E2013-01914-CCA-R3-CD, 2014 WL 3888250, at *6 (Tenn. Crim. App. Aug. 8, 2014) ("[C]onsent occurs at the point that a driver undertakes the privilege of operating a motor vehicle in the State of Tennessee, not at the point the implied consent form is read[.]"); Shirley Larhonda Gagne, 2011 WL 2135105, at *8 (concluding that the language of the implied consent statute, which states that anyone who drives a vehicle in Tennessee "is deemed to have given consent" to testing, "thereby supplements the constitutional basis for a warrantless drug or alcohol test by deeming a motorist to have 'consented' to such a test"); James Stacey Carroll, 2002 WL 1841627, at *6 ("[A]nyone who exercises the privilege of operating a motor vehicle in this state has consented in advance to submit to an alcohol test; Michael A. Janosky, 2000 WL 1449367, at *4 ("[O]ur legislature has declared that consent of all motorists is implied; therefore, it is unnecessary for law enforcement officers to obtain the voluntary consent of an individual motorist before administering a breath test for alcohol concentration level.").

However, in each of these cases, the court held that the test results were also properly admissible under the exigent circumstances exception to the warrant requirement. Because the holdings in the above cases were dependent on the exigent circumstances exception to the warrant requirement, we agree that "the broad statements regarding the issue of consent can be read as mere dicta." James Dean Wells, 2014 WL 4977356, at *7. In considering the validity of implied consent as a stand-alone exception to the warrant requirement, the James Dean Wells court aptly noted: "[W]e have found no cases in this state, and the state cites to none, that rely on the implied consent law as the only exception to the warrant requirement." Id.

The State concedes that the law in this area is unsettled because some panels of this court have held that the implied consent statute satisfies the Fourth Amendment while other panels have held that it does not. Compare State v. Helkie Nathan Carter,

- 18 -

No. M2015-00280-CCA-R9-CD, 2017 WL 1278697, at *6 (Tenn. Crim. App. Apr. 5, 2017) ("[T]he implied consent statute serves as a tool the State may use to persuade a defendant to submit to a blood test, but it does not, alone, create consent for the purposes of the Fourth Amendment."), with State v. Corrin Kathleen Reynolds, No. E2013-02309-CCA-R9-CD, 2014 WL 5840567, at *10 (Tenn. Crim. App. Nov. 12, 2014) ("[W]hether Defendant gave actual consent is irrelevant, if the implied consent statute was triggered by probable cause to believe that she was driving under the influence and if the Defendant never refused the blood draw."), aff'd on other grounds by State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016), State v. Darryl Alan Walker, 2014 WL 3888250, at *6 ("Because there is no proof that the Defendant refused to submit to the test, his implied consent remained valid, and his contention that his consent was involuntary is without merit."), and Humphreys, 70 S.W.3d at 762 ("[V]oluntary consent is unnecessary as consent has already been obtained by the act of driving the motor vehicle upon the public roads of this state.").

The State urges this court to conclude that Tennessee's implied consent statute satisfies the consent exception to the warrant requirement so long as the motorist's consent is not revoked or withdrawn. It claims that because Henry consented, by accepting the privilege of driving in Tennessee, and never withdrew his consent, the results from his mandatory blood draw should not have been suppressed.

While warrantless searches are presumptively unreasonable, "this presumption may be overcome if the State demonstrates by a preponderance of the evidence that the warrantless search—here the warrantless blood draw—was conducted pursuant to an exception to the warrant requirement." Reynolds, 504 S.W.3d at 304 (citing King, 563 U.S. at 459; Bell, 429 S.W.3d at 529; Meeks, 262 S.W.3d at 722). In this case, Henry was informed that the blood test was mandatory because of his prior DUI convictions but was never told that refusal to submit to the blood test would result in the suspension of his driver's license, as required by Code section § 55-10-406(c). Pursuant to Birchfield, Henry's search cannot be justified as a search incident to his arrest or on the basis of implied consent. Birchfield, 136 S. Ct. at 2186. The facts from the suppression hearing show that the officers never obtained a warrant in Henry's case and that no exigent circumstances existed that would excuse the need for a warrant.

Consequently, the only possible justification for the warrantless blood draw in this case was whether Henry consented to it, either by virtue of the implied consent law or by voluntarily consenting to the blood test. "The consent exception to the warrant requirement applies when a person voluntarily consents to a search." Reynolds, 504 S.W.3d at 306 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Berrios, 235 S.W.3d 99, 109 (Tenn. 2007)). The State has the burden of establishing that a defendant's "'consent was, in fact, freely and voluntarily given.'" Reynolds, 504

S.W.3d at 306 (quoting Schneckloth, 412 U.S. at 222). To be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting Berrios, 235 S.W.3d at 109). A defendant's will cannot be overborne and his act of consenting must be "the product of an essentially free and unconstrained choice." Cox, 171 S.W.3d at 185. Whether consent to a search is voluntary is a question of fact to be determined from the totality of the circumstances. Reynolds, 504 S.W.3d at 307 (citing Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184, 186); Berrios, 235 S.W.3d at 109.

Factors to consider in determining whether consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police. Cox, 171 S.W.3d at 185. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent is voluntary. Id. (internal quotation marks omitted). Also, proof including, but not limited to, evidence regarding the defendant's physical condition and the adverse effects of medications on a defendant's judgment and reasoning may establish that a defendant lacks the capacity to voluntarily consent. Cf. Reynolds, 504 S.W.3d at 309. Finally, as particularly significant in this case, an individual's "'[k]nowledge of the right to refuse consent'" is also a factor in determining the voluntariness of consent. Id. at 307 (quoting Schneckloth, 412 U.S. at 235-47).

Many states have held that implied consent does not satisfy the requirements of the Fourth Amendment. In Reynolds, the Tennessee Supreme Court recognized that seven jurisdictions have refused to hold that statutory implied consent satisfies the consent exception to the warrant requirement.[4] 504 S.W.3d at 309 n.19. We have found at least five additional jurisdictions that have held that statutory implied consent does not qualify as consent under the Fourth Amendment.[5]

---

[4] The Tennessee Supreme Court specifically noted that the following jurisdictions had declined to conclude that implied consent satisfies the consent exception to the warrant requirement: Flonnory v. State, 109 A.3d 1060, 1065 (Del. 2015); State v. Modlin, 867 N.W.2d 609, 619 (Neb. 2015); Byars v. State, 336 P.3d 939, 946 (Nev. 2014); State v. Wulff, 337 P.3d 575, 581 (Idaho 2014); State v. Fierro, 853 N.W.2d 235, 243 (S.D. 2014); State v. Declerck, 317 P.3d 794, 804 (Kan. Ct. App. 2014); Aviles v. State, 443 S.W.3d 291, 294 (Tex. App. 2014); Weems v. State, 434 S.W.3d 655, 665 (Tex. App. 2014).

[5] State v. Baird, 386 P.3d 239, 249 n.8 (Wash. 2016) (reiterating that the "implied [c]onsent in the statute does not act as valid consent for a search" and asserting that "absent a warrant or an exception, an officer must obtain actual consent for a breath test."); Williams v. State, 771 S.E.2d 373, 376-77 (Ga. 2015) (distinguishing compliance with the implied consent statute from the constitutional question of

- 20 -

As we noted, Code section 55-10-406 states that "[a]ny person who drives a motor vehicle in this state is deemed to have given consent" to a test to determine the alcoholic content or drug content of that person's blood. This concept of "implied consent" to testing is open to two competing interpretations. The State doggedly asserts that "implied consent" in the statute should be interpreted as satisfying the consent exception to the warrant requirement. On the other hand, Henry argues that "implied consent" should be interpreted, not as voluntary consent under the Fourth Amendment, but as consent to certain penalties if the motorist refuses to cooperate with testing. See Birchfield, 136 S. Ct. at 2169 (noting that the States' "implied consent" laws "provided that cooperation with BAC testing was a condition of the privilege of driving on state roads and that the privilege would be rescinded if a suspected drunk driver refused to honor that condition"); cf. State v. Padley, 849 N.W.2d 867, 876 (Wis. Ct. App. 2014) ("The existence of this 'implied consent' does not mean that police may require a driver to submit to a blood draw. Rather, it means that, in situations specified by the legislature, if a driver chooses not to consent to a blood draw (effectively declining to comply with the implied consent law), the driver may be penalized."). Henry claims that even under the mandatory blood draw provisions in Code section 55-10-406(d)(5), an officer must comply with constitutional requirements in obtaining the blood sample, and, if necessary, seek a warrant. He argues that "[n]o part of this statute should be read as purporting to require, or to independently authorize, a warrantless search." As support for the its interpretation of "implied consent," Henry asserts that the "deemed to have given consent" language found in most implied consent laws was not meant to provide justification for the test itself but was for the purpose of encouraging a motorist's cooperation with breath or blood testing by providing a penalty for refusal to submit to the test. For the reasons that follow, we agree with Henry, and conclude that implied consent does not operate to satisfy the requirements of the Fourth Amendment.

Henry points out, and we agree, that James Dean Wells noted that at the time that the mandatory blood provisions were enacted, the legislative history never indicated that "implied consent" would operate as constitutionally-valid consent because the legislators continued to believe, pursuant to Schmerber, that exigent circumstances justifying the search existed in every drunk driving case:

---

whether the motorist gave actual consent for the testing and reiterating that "[w]hen relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." (internal quotation marks omitted)); State v. Butler, 302 P.3d 609, 613 (Ariz. 2013) ("We hold now that, independent of [the implied consent statute], the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw."); Stevens v. Comm'n of Pub. Safety, 850 N.W.2d 717, 725 (Minn. Ct. App. 2014) ("[T]he plain language of the [implied consent] statute authorizes a search of a driver's blood, breath, or urine only if the driver gives express, valid consent to such a search."); People v. Mason, 214 Cal.Rptr.3d 685, 702 (Cal. App. Dep't Super. Ct. Dec. 29, 2016) ("To recap, we have concluded that advance "deemed" consent under the implied consent law cannot be considered actual Fourth Amendment consent.").

The legislative history of the 2009 addition of subsection (f) related to the mandatory draw reflects the legislature's (not, at the time, unreasonable) understanding that any Fourth Amendment concerns were generally allayed by the exigent circumstances exception to the warrant requirement. When the 2009 mandatory draw subsection for accidents involving injuries and deaths was added, the bill's sponsor in the House introduced the bill with a discussion that essentially clarified that the draw would occur under exigent circumstances. See Hearing on H.B. 355 Before the H. Judiciary Criminal Practice & Procedure Sub–Comm., 106th Gen. Assembly (Tenn. Mar. 18, 2009) (statement of Rep. Jim Hackworth). In the House subcommittee, the question was raised whether a warrant was required by the statute, and Tom Tigue, Deputy Legislative Attorney, responded that as written there was no requirement for a search warrant, citing the evanescent nature of blood alcohol evidence. Id. (statement of Rep. Tom Tigue, Deputy Legislative Attorney). . . .

In 2011, Tom Kimball, the Tennessee traffic safety resource prosecutor from the District Attorney Generals Conference, told the legislative committees of both houses that under Schmerber, the circumstances would be exigent. Hearing on H.B. 715 Before H. Judiciary Comm., 107th Gen. Assembly (Tenn. Apr. 19, 2011); Hearing on S.B. 1270 Before Sen. Judiciary Comm., 107th Gen. Assembly (Tenn. May 11, 2011). Mr. Kimball elaborated that under current Tennessee caselaw, a blood draw in a fatal or serious-injury accident would always be conducted pursuant to the exigent circumstances exception. Id.

James Dean Wells, 2014 WL 4977356, at *17.

We see nothing in the legislative history for the mandatory blood draw provisions to suggest that legislators intended for "implied consent" to qualify as an exception to the warrant requirement or that they believed the mandatory blood draw provisions changed the meaning of "implied consent" under the statute. Moreover, in Charles A. Kennedy, 2014 WL 4953586, at *12, this court recognized, "[A] conclusion that the legislature intended to create an exception to the state and federal constitutional warrant requirements would require us to declare [the implied consent] statute unconstitutional." In that case, the court presumed that the General Assembly was aware that it could not thwart the Fourth Amendment by legislative enactment. Id. While recognizing that the implied consent statute is silent as to whether a warrant is required for a mandatory blood draw, the court concluded that the statute was not intended "to operate as a blanket exception to the warrant requirement." Id.; see James Dean Wells, 2014 WL 4977356, at *13. After considering the Birchfield decision, the definition of consent as an exception

- 22 -

to the warrant requirement, and the history of implied consent statutes, we conclude that statutory implied consent, on its own, cannot justify warrantless breath or blood draws in Tennessee, including mandatory blood draws under Code section 55-10-406(d)(5). This conclusion, naturally, means that Humphreys should be abrogated. In reaching this decision, we recognize that any analysis of whether a motorist withdrew or revoked his implied consent is immaterial because implied consent does not qualify as consent under the United States and Tennessee Constitutions. Instead, the pertinent question is whether Henry voluntarily consented to the blood test in this case.

Therefore, we must next consider whether the totality of the circumstances establishes that Henry voluntarily consented to the warrantless blood test in this case. Although the trial court relied on a procedural reason, namely the officers' failure to comply with Code section 55-10-406(c), in concluding that the blood draw was illegal, we conclude that this issue is better addressed by determining whether Henry voluntarily consented to the warrantless blood draw in this case. As we previously recognized, Henry was informed only that the blood draw was mandatory in light of his prior DUI convictions and was never informed by any officer that refusal to submit to the blood test would result in the suspension of his driver's license. The officers never read an implied consent form to Henry or had Henry read the form and never had Henry sign the form. Even if we assume that the version of the implied consent law in effect at the time of Henry's offense is not unconstitutional, the proof regarding whether a motorist received the implied consent advisory is but one circumstance among many that this court must consider in determining whether the motorist voluntarily consented to a breath or blood test.

At the time of his arrest, Henry told Sergeant Rhodes that he had "blacked out" as he was driving and had recently taken prescription pain medication, which are facts that raise substantial concerns as to whether he had the capacity to voluntarily consent to a blood test at that time. Cf. Reynolds, 504 S.W.3d at 309 ("Given the lower courts' conclusion that the defendant did not actually consent to the blood draw and the trial court's factual findings based upon medical proof in the record regarding the defendant's physical condition and the adverse [e]ffects the medications had on her judgment and reasoning, the record does not establish that the defendant had the capacity to revoke her statutory implied consent."). The officers' failure to fully inform Henry of his right to refuse or of the consequences for refusal under the implied consent statute denotes a coercive environment in which Henry could not have intelligently given his consent at the time of the blood draw. See id. at 307. After considering the totality of the circumstances in this case, we simply cannot conclude that Henry voluntarily consented to his warrantless blood draw. Because no other exceptions to the warrant requirement apply in this case, we conclude that Henry's Fourth Amendment rights were violated when his blood was drawn pursuant to Code section 55-10-406(d)(5) without a warrant.

Therefore, we affirm the judgment of the trial court suppressing the results from the blood draw.

The State claims that although the trial court suppressed the results from the blood draw based on the officers' failure to read the Implied Consent Form to Henry, as required by Code section 55-10-406(c), this court expressly rejected such an argument in Shirley Larhonda Gagne, 2011 WL 2135105. In that case, a deputy testified that while he did not bring an Implied Consent Form to the hospital or read the form's provisions to the defendant, he nevertheless informed her that she had "the right to refuse" a blood test and that "if she did refuse, that it could result in the suspension of the license." Id. at *3. This court held that "once a law enforcement officer has reasonable grounds to believe a motorist is under the influence of an intoxicant, the officer may administer a drug or alcohol test without further ascertaining whether the motorist consented in a subjective sense to the test." Id. at *9 (citing Michael A. Janosky, 2000 WL 1449367, at *4). The court then held that "[w]ith proof that the motorist was 'advised of the consequences of such a refusal,' which usually consists of an implied consent form signed by the motorist, the State may prosecute the Defendant for 'violation of the implied consent law,' which, if successful, results in the loss of the motorist's license for one year." Id. However, the court asserted that the "Implied Consent statute's refusal provision does not affect the constitutional and statutory bases for performing a warrantless search of a motorist's blood." Id. In other words, the court held that "a motorist's consent to a drug or alcohol screen is not contingent upon whether he has executed an implied consent form; it is present from the moment 'reasonable grounds [exist] to believe such a person was driving under the influence of an intoxicant or drug.'" Id. (quoting T.C.A. § 55-10-406(a)(1) (Supp. 2006)).

The State argues that this language from Shirley Larhonda Gagne means that although the State would be barred from prosecuting Henry for an implied consent violation based on the officers' failure to read the Implied Consent form or advise him of the consequences of refusal, the officers' failure to do these things does not affect the admissibility of the results from the blood draw on a constitutional basis. See id. We disagree, and conclude that Shirley Larhonda Gagne directly contravenes the clear language in Code section 55-10-406(c), stating that an officer "shall, prior to conducting either test or tests, advise the driver that refusal to submit to the test or tests will result in the suspension by the court of the driver's operator's license." This case is also distinguishable because it relies on the motorist's implied consent to justify a warrantless blood test. As we previously held, implied consent under the statute is not a per se exception to the warrant requirement for blood or breath tests and does not qualify as voluntary consent under the Fourth Amendment.

- 24 -

The State also asserts that Missouri v. McNeely, 133 S. Ct. 1552 (2013), approves the use of implied consent laws to justify a mandatory blood draw. While acknowledging that McNeely dealt with the exigent circumstances exception and failed to apply the consent exception to the warrant requirement, the State claims that the four-justice plurality in McNeely correctly noted that "all 50 states have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol content] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." Id. at 1566. Moreover, the plurality stated that implied consent laws were an example of the "broad range of legal tools" the states can use "to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." Id. Finally, the plurality recognized that implied consent laws "impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution." Id. Accordingly, the State claims McNeely indicates that implied consent laws survive Fourth Amendment scrutiny, at least as long as the motorist does not withdraw or revoke consent. Again, we have already held that "consent" under the implied consent statute is not voluntary consent to search but consent to certain consequences should permission to search be withheld. When interpreted this way, Tennessee's implied consent statute survives Fourth Amendment scrutiny, as indicated in McNeely; however, it also precludes any conclusion that implied consent qualifies as voluntary consent under the Fourth Amendment.

Finally, the State asserts that Darryl Alan Walker, 2014 WL 3888250, supports its argument that Tennessee's implied consent statute satisfies the consent exception to the warrant requirement so long as that consent is not revoked or withdrawn. In that case, the officer testified that he had to stay at the scene of the accident for a period of time before traveling to the hospital, and once there, his investigation was further delayed because he had to wait for the defendant to have his wound closed before interviewing him. Id. at *5. Based on this evidence, this court held that exigent circumstances made obtaining a warrant impractical under McNeely. Id. The court also held, "Because there is no proof that the Defendant refused to submit to the test, his implied consent remained valid, and his contention that his consent was involuntary is without merit." Id. at *6. As we previously concluded, any analysis of whether a motorist withdrew or revoked his implied consent is immaterial because implied consent does not qualify as consent under the United States and Tennessee Constitutions. Because the only relevant question is whether the motorist voluntarily consented to a blood or breath test, Darryl Alan Walker has no impact on our decision in this case. For all the reasons articulated in this section, we conclude that statutory implied consent is not an exception to the warrant requirement.

- 25 -

**II.  Applicability of Good-Faith Exception.**  The State also argues that the good-faith exception to the exclusionary rule, as outlined in Reynolds, 504 S.W.3d 283 (Tenn. 2016), applies to Henry's case because the officers conducted the warrantless blood draw pursuant to the binding authority of State v. Humphreys and the implied consent statute. While the State recognizes that it did not specifically argue a good-faith exception in the trial court, it asserts that it did "emphasize through its proof the belief and mindset of the officers, thus providing evidence upon which this Court could review the actions of the officers for good faith."  As support for the application of the good-faith exception, the State asserts that Humphreys continues to be binding authority and that the implied consent statute has never been struck down as unconstitutional.  It also claims that the exclusion of test results in this case would not deter police conduct.

We conclude that the State has waived our consideration of this issue by failing to present it at the trial court level.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005) ("When an issue is raised for the first time on appeal, it is typically waived."); State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) ("Ordinarily, issues raised for the first time on appeal are waived."); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court."); Charles A. Kennedy, 2014 WL 4953586, at *10 ("Because the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it.").  The record shows that because the State did not present this issue at the suppression hearing, the trial court did not have the opportunity to pass on it, which would generally mean that we would not consider it.  However, because this is an issue of great significance, not only to Henry, but to all the citizens of Tennessee, we will address this issue.

The State argues that the proof at the suppression hearing established that the officers acted under a good faith belief that Henry's prior DUI conviction made a blood draw mandatory.  It notes that the officers had probable cause to believe that Henry was driving under the influence, based on his signs of impairment and his poor performance on several field sobriety tests, and had probable cause to believe that Henry had previously been convicted of a DUI after dispatch checked his license.  Consequently, the State argues it was reasonable for the officers to believe that Code section 55-10-406(d)(5)(B) made the blood draw mandatory for Henry, with or without his consent.  As support for his claim that they acted in good faith, the State asserts that both officers testified they believed a search warrant was required upon refusal of the test and that both claimed they would have obtained a warrant had Henry refused the blood draw.

- 26 -

In order to address this issue, we must carefully evaluate the good-faith exception adopted by the Tennessee Supreme Court in State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016). In Reynolds, the Court recognized that the State had not challenged the lower courts' conclusion that the defendant did not voluntary consent to the blood draw and argued only that the implied consent statute satisfied the consent exception to the warrant requirement because the defendant had not revoked or withdrawn her implied consent. Id. at 308-09. The Court noted that even if it assumed the State was correct that implied consent satisfied the consent exception, the State could not prevail because the record did not show that "the defendant had the capacity to revoke her statutory implied consent." Id. at 309. Nevertheless, the court held, "[E]ven if the warrantless blood draw violated the state and federal constitutional prohibitions against unreasonable searches, we conclude . . . that the exclusionary rule does not require suppression of the evidence because the warrantless blood draw was conducted in objectively reasonable, good-faith reliance on binding precedent." Id. The Court then adopted the good-faith exception to the exclusionary rule as announced by the United States Supreme Court in Davis v. United States, 564 U.S. at 241, that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." Reynolds, 504 S.W.3d at 312. The court explained that "the Davis good-faith exception we adopt applies only when the law enforcement officers' action is in objectively reasonable good faith reliance on 'binding appellate precedent' that 'specifically authorizes a particular police practice.'" Id. at 313 (quoting Davis, 564 U.S. at 241). The court made it clear that "[p]ersuasive precedent from other jurisdictions" was an insufficient basis for applying the Davis good-faith exception and that this exception would not "permit law enforcement officers to 'extend the law to areas in which no precedent exists or the law is unsettled.'" Id. (quoting State v. Lindquist, 869 N.W.2d 863, 876-77 (Minn. 2015)). The court viewed its decision to adopt the Davis good faith exception as "adequately preserving the protections provided by our state and federal constitutions while not penalizing police officers for performing their duties conscientiously and in good-faith." Id. (internal quotation marks omitted). After having adopted the Davis good-faith exception, the court applied it in the Reynolds case:

Prior to McNeely, no warrant was required for a blood draw in drunk driving cases because Tennessee courts had interpreted Schmerber as establishing a broad categorical rule that the natural dissipation of alcohol within the bloodstream presents an exigent circumstance, justifying a warrantless blood draw in every drunk driving case. See, e.g., Humphreys, 70 S.W.3d at 761. As a result, even though Deputy Strzelecki believed the defendant had actually consented to the blood draw, his action in obtaining her blood without a warrant was in objectively reasonable good-faith reliance on binding precedent. Under these circumstances, we conclude that the good-faith exception applies, and the exclusionary rule does not

require suppression of the evidence derived from the testing of the defendant's blood.

Id. at 314 (footnote omitted).

Initially, we cannot overemphasize the fact that at the time of the warrantless blood draw in Henry's case, McNeely had already been decided. The McNeely case was decided in April 2013, and Henry's search took place in March 2015, nearly two years later. Therefore, it simply cannot be said that the officers obtained Henry's blood sample in "objectively reasonable good-faith reliance on binding precedent" holding that exigent circumstances justified a warrantless blood draw in every drunk driving case.[6] Id.

Although the State relies on both the implied consent statute and Humphreys to support its argument that the good-faith exception adopted in Reynolds should be applied, we conclude that neither supports the application of the good-faith exception in Henry's case. Sergeant Rhodes admitted that the proper procedure, even in a mandatory blood draw situation, was for the officer to read the implied consent form to the motorist, and if the motorist refused the test, then the officer would seek a warrant. Such an interpretation is consistent with other opinions of this court. See Charles A. Kennedy, 2014 WL 4953586, at *12; James Dean Wells, 2014 WL 4977356, at *13. Despite the recognition that this was the appropriate way to proceed in a mandatory blood draw case, no officer at the scene followed this procedure. Putting aside the obvious problems with the implied consent law in effect at the time of this incident, the officers in this case failed to follow the implied consent statute as written, which required them to "advise the motorist that refusal to submit to the test or tests will result in the suspension of the motorist's driver's license and may result in other enumerated consequences." T.C.A. § 55-10-406(c). The fact that this was a mandatory blood draw did not excuse their failure to do this because Code sections 55-10-406(d)(1)(5)(A), (B) require that "[t]he test shall be performed in accordance with the procedure set forth in this section[.]" Because the officers failed to advise Henry that refusal of the blood test would result in the suspension of his driver's license, as required by Code section 55-10-406, it cannot be said that the

---

[6] Recently, following a remand by the Tennessee Supreme Court for reconsideration of cases in light of State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016), this court held that because warrantless blood draws were ordered prior to the ruling in McNeely, the good-faith exception to the exclusionary rule applied, and the results from the blood tests were admissible. See State v. Micah Alexander Cates, No. E2014-01322-CCA-R3-CD, 2017 WL 3017290, at *7-8 (Tenn. Crim. App. July 17, 2017); State v. Christopher Wilson, No. W2015-00699-CCA-R9-CD, 2017 WL 2275806, at *3-4 (Tenn. Crim. App. May 24, 2017); State v. Helkie Nathan Carter, No. M2015-00280-CCA-R9-CD, 2017 WL 1278697, at *7 (Tenn. Crim. App. Apr. 5, 2017). We believe that Henry's case is distinguishable from these cases because at the time of Henry's warrantless blood draw, McNeely had already been decided.

officers' actions were in "objectively reasonable good faith reliance" on Tennessee's implied consent law. Reynolds, 504 S.W.3d at 313.

Moreover, as to Humphreys impact on the good-faith exception, we have already held that Humphreys should be abrogated because the implied consent statute neither qualifies as a per se exception to the warrant requirement nor satisfies the voluntary consent exception to the warrant requirement. In light of the United States Supreme Court's holding in McNeely, we simply cannot conclude that Humphreys, a case that is now more than fifteen years old, amounts to "binding appellate precedent" in order for the good-faith exception to apply. See id. As we noted, the search in Humphreys was justified based on the exigent circumstances exception and it was only in dicta that the court stated, "[T]he statutorily created implied consent of the motorist permits the warrantless search of the motorist's breath or blood." Humphreys, 70 S.W.3d at 761. We have yet to find a case in Tennessee that justifies a warrantless blood draw only on the basis of implied consent, which precludes a conclusion that Humphreys amounts to "binding appellate precedent" on this issue.

We further conclude that the law in this area was clearly unsettled at the time the search in Henry's case took place. Aside from Humphreys' inherent unreliability on this issue and the sheer absence of cases relying solely on implied consent as justification for warrantless searches, this court held in James Dean Wells and Charles A. Kennedy, cases that were decided prior to the search in Henry's case, that the implied consent statute does not qualify as an exception to the warrant requirement. See Charles A. Kennedy, 2014 WL 4953586, at *12; James Dean Wells, 2014 WL 4977356, at *13.

Since Henry's search was conducted, the Tennessee Supreme Court in Reynolds refused to rely on Humphreys to justify the search and specifically "decline[d] to determine . . . whether the implied consent statute satisfies the consent exception to the warrant requirement or whether the implied consent statute violates the federal or state constitution by authorizing warrantless blood draws." Reynolds, 504 S.W.3d at 308. Shortly after the Reynolds decision, this court in Helkie Nathan Carter, referred approvingly to the holding in James Dean Wells that in order for a mandatory blood draw to comply with the Fourth Amendment, "'it must be supported by a warrant issued by an independent magistrate finding probable cause or by exigent circumstances, voluntary [actual] consent, or some other exception to the warrant requirement.'" Helkie Nathan Carter, 2017 WL 1278697, at *6 (quoting James Dean Wells, 2014 WL 4977356, at *13). When the United States Supreme Court considered the justification of warrantless blood tests in Birchfield v. North Dakota, it held that "police have other measures at their disposal when they have reason to believe that a motorist may be under the influence of some other substance (for example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood)." Birchfield, 136 S. Ct. at 2184. The Court

- 29 -

then concluded that "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not." Id. Even more recently, on May 5, 2017, the legislature has passed an act extensively amending the implied consent law and allowing a law enforcement officer to administer a blood test only upon a search warrant, exigent circumstances, or consent of the driver following the driver's execution of a standardized waiver developed by the department of safety, none of which existed in Henry's case. See Act of May 5, 2017, 2017 Tenn. Laws Pub. Ch. 304 (H.B. 39 substituted for S.B. 134) (effective July 1, 2017).

For all of these reasons, the days of conducting warrantless blood draws in DUI cases are over, barring the existence of truly exigent circumstances, some other recognized exception to the warrant requirement, or the exceedingly rare case in which a detained motorist has the capacity to voluntarily consent to a blood test. For the reasons stated in this opinion, and notwithstanding the State's waiver of this issue, we conclude that the good-faith exception adopted in Reynolds does not apply to Henry's case.

**III. Reduced Expectation of Privacy.** Finally, the State claims that motorists with prior DUI convictions, like Henry, have a reduced expectation of privacy under the Fourth Amendment when detained for a subsequent driving while impaired offense. The State has waived this issue by raising it for the first time at oral argument and by providing no authority in support of issue. See Tenn. R. App. P. 36(a); Maddin, 192 S.W.3d at 561; Alvarado, 961 S.W.2d at 153; Turner, 919 S.W.2d at 356-57; Charles A. Kennedy, 2014 WL 4953586, at *10; see also Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (stating that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"). However, in the interests of fully exploring this issue, we will briefly address it.

The State, in suggesting that a reduced expectation of privacy exists, compares motorists with prior DUI convictions to probationers and parolees, who forego a certain expectation of privacy in exchange for the privilege of being placed on probation or parole. The State also claims that motorists, who have a prior conviction for DUI have clearly abused the privilege of driving and, therefore, have a reduced expectation of privacy. In addressing these claims, we note that based on our research, neither the United States Supreme Court nor the Tennessee Supreme Court has ever indicated that individuals with a prior conviction for DUI do not have the same protections against unreasonable searches and seizures as other individuals suspected of driving while

impaired. We agree with Henry that a State may not impose a condition on a privilege that would require the relinquishment of a constitutional right:

> It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

Frost v. Railroad Comm'n, 271 U.S. 583, 593-94 (1926); see Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 657 (1981) ("[A] State may not impose unconstitutional conditions on the grant of a privilege."); Southern Pacific Co. v. Denton, 146 U.S. 202, 207 (1892) (holding that a statute, which "require[ed] the corporation, as a condition precedent to obtaining a permit to do business within the state, to surrender a right and privilege secured to it by the constitution and laws of the United States, was unconstitutional and void"). We reiterate that if the mandatory blood draw provision is held to authorize warrantless blood tests that are not justified by a recognized exception to the Fourth Amendment warrant requirement, then it is unconstitutional. For all of the reasons stated in this opinion, the State is not entitled to relief.

## CONCLUSION

Because the State has failed to show that Henry's blood was drawn pursuant to a recognized exception to the warrant requirement and because the good-faith exception adopted in Reynolds does not apply, we affirm the judgment of the trial court suppressing the results of the warrantless blood draw.

_____
CAMILLE R. McMULLEN, JUDGE