# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3061

_____

| | | |
|---|---|---|
| Bradley Lee Winters, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Northern |
| Robert Adams and Craig Prahm, | * | District of Iowa, Central Division |
| | * | |
| Appellants. | * | |

_____

Submitted: April 13, 2001
Filed: June 25, 2001

_____

Before BYE, BEAM, Circuit Judges, and NANGLE,[1] Senior District Judge.

_____

NANGLE, Senior District Judge.

Robert Adams and Craig Prahm appeal from the final judgment entered in favor of plaintiff/appellee in the District Court for the Northern District of Iowa. The appellants argue that they were entitled to judgment in their favor for three reasons: (1) the trial court erred in ruling that appellants violated appellee's Fourth Amendment rights by extending an investigatory encounter based on a community caretaking standard; (2) the trial court erred in finding that appellant Adams used excessive force

_____

[1] The HONORABLE JOHN F. NANGLE, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

against appellee when Adams struck appellee in the eye; and (3) the appellants contend that they are entitled to qualified immunity. For the following reasons, we agree with appellants' contentions. Accordingly, we reverse and dismiss appellee's complaint in its entirety.

## I. BACKGROUND

Plaintiff/appellee Bradley Winters brought this action pursuant to 42 U.S.C. § 1983, alleging an unreasonable seizure and an excessive use of force by defendants/appellants, who are police officers, in violation of his Fourth Amendment rights. On the evening of July 22, 1995 between 10:30 p.m. and 11:30 p.m., dispatchers at the Mason City, Iowa Police Department received a complaint concerning an unknown individual in a residential area of the city. The complaint indicated that this person was possibly intoxicated and was observed exiting and reentering a vehicle that was parked on a dead-end street. Mason City police officers were sent to investigate. Appellant Officer Robert Adams arrived and observed an individual seated behind the wheel of a car parked in the location matching the described location of the vehicle.[2] That appellants later identified that individual as appellee Winters.

Appellant Adams approached the vehicle and inquired as to appellee's circumstances. Appellee responded that he was waiting for a push to start his car. Officer Adams then asked appellee for identification. In response, appellee raised the car window, locked the door and stated that he wished to be left alone. Adams then walked around to the passenger side,[3] and appellee raised that window as well and

---

[2] At the hearing, appellant Officer Prahm testified that appellee's vehicle was the only vehicle in the area at the time he arrived.

[3] The parties dispute whether appellant Adams initially approached the driver's side and then proceeded to the passenger side, or visa versa. The Court finds that the resolution of that fact dispute is not relevant for purposes of this appeal.

locked the passenger side door. At this point, Adams testified that he had not observed specific criminal activity, but he continued to ask appellee to exit the vehicle and produce identification.

Appellant Adams testified that appellee was agitated and evasive when Adams approached the vehicle. Adams further testified that appellee kept his head lowered and wore a wide brimmed hat. According to Adams's testimony, appellee "was trying his darnedest to not make eye contact . . . ." App. at 55. Adams described appellee as appearing to be in a highly agitated state, and appellee began moving "wildly" about the car. App. at 57. Adams testified that appellee was moving about the vehicle and was "just not able to sit still." App. at 61.

Shortly thereafter, appellant Officer Prahm arrived, responding to the same dispatch. Adams informed Prahm that appellee was "acting strangely" and would not exit the vehicle or talk to Adams. App. at 80. Prahm also testified that Adams informed him that appellee would not identify himself and refused to make eye contact. According to appellant Prahm, Adams did not convey a concern for appellee's health at that time. Officer Prahm characterized appellee as "extremely hyper." App. at 82. Although Adams testified that he did not believe that appellee was "[i]ntoxicated by use of an alcoholic beverage" (App. at 57), after appellant Prahm arrived, the officers began to suspect that appellee "ingested or used some type of illegal drug and maybe used too much and was overdosing." App. at 61. Prahm reiterated Adams's testimony that the officers began to conclude that appellee was "under some sort of influence." App. at 83. Appellee became increasingly agitated with the officers and yelled at them to leave him alone.

Both officers testified that given the possibility of intoxication as noted in the initial dispatch, they were initially concerned with determining appellee's physical condition in order to ensure that "he would not be able to drive and hurt someone." App. at 54, 87. The officers decided that they should attempt to enter the vehicle to

3

determine "just how far under the influence this subject may be." App. at 84. Appellant Prahm attempted to unlock one of the doors with the assistance of a "Slim Jim," while Adams attempted to divert appellee's attention toward the other side of the vehicle. Appellee jumped from side to side in order to keep the doors locked until he finally stretched across the vehicle so he could hold both locks down at the same time. At this point, neither officer had called an ambulance, and Prahm and Adams both testified that they did not know what action they would have taken had they successfully gained entry into the vehicle. Adams testified that he did not recall asking appellee whether he was in need of medical attention. Prahm's repeated attempts to gain entry into the vehicle proved unsuccessful.

Appellant Adams testified that while the officers were attempting to gain entry into appellee's car, Adams notified his shift commander, Lieutenant Richard Jensen, and informed him of the situation. Jensen arrived at the scene shortly thereafter. Jensen testified that appellee "was sweating, he was very agitated, [and in a] very animated state. He did not want us anywhere near the vehicle . . . ." App. at 100. Jensen further testified that he quickly concluded that appellee was seriously "mentally impaired" or under the influence of some type of controlled substance and in need of medical assistance. App. at 100-01. Jensen then made the decision that appellee should be taken to the hospital.

Jensen testified that at that point, he had witnessed no illegal activity by appellee. However, Jensen stated that he felt that he had a responsibility to protect appellee and "the public at large to make sure this person can't hurt anyone else." App. at 102. Accordingly, Jensen decided to break the passenger window of the car with his nightstick, in order to remove appellee from the vehicle. Jensen called an ambulance before breaking the window. Additionally, prior to breaking the window, Jensen attempted to contact the owner of the vehicle in order to obtain a key.

4

As the window broke, appellee crawled into the hatchback area behind the front seats of the vehicle. With the window out, the officers were able to unlock the front doors. Appellants Adams and Prahm entered the front seats and attempted to remove appellee from the car. Adams testified that appellee's resistance was "extremely violent." Adams further testified that appellee "was thrashing around trying to fend us off and fight with us. And when we would try to grab him, [appellee] would kick us or kick at us or punch us or whatever he could do to keep us away from him." App. at 72. While Adams was attempting to remove appellee from the vehicle, appellee contends that Adams called him a "little bastard" and then Adams punched appellee in the eye. App. at 22. Adams denies punching appellee.[4]

Once the officers opened the rear hatch, appellant Adams testified that appellee attempted to flee. Lieutenant Jensen and several other officers became involved in the attempt to detain appellee. Ultimately, appellee was forcibly taken to the ground and then handcuffed. Appellee contends that he was grabbed around the neck and "slammed" to the gravel road surface.[5] App. at 24. The first time the police were able to identify appellee Winters was after appellants finally removed him from the vehicle and placed him into restraints. The appellee was then transported by ambulance to the hospital emergency room. At the hospital, appellee was characterized by staff as becoming "extremely physically violent towards staff when approached." App. at 141.

---

[4] The trial court determined that appellant Adams did indeed strike appellee Winters in the eye after Winters himself either punched or kicked Adams in the face during the struggle in the vehicle. In their brief, the appellants state that they do not challenge this factual determination. Appellants' Br. at 18. The Court will assume that Adams struck Winters in the right eye for purposes of this appeal.

[5] The trial court specifically found that the force used by the officers after appellee was outside of the vehicle was appropriate "to subdue a violently uncooperative subject." Appellants' Br. at Addendum at 13 (Zoss opinion).

5

Consequently, appellee had to be restrained in leather straps.[6] His diagnosis was "methamphetamine intoxication." App. at 122.

## II. DISCUSSION

### A. The Investigatory Encounter

The appellants argue that the district court erred in ruling that they violated appellee's Fourth Amendment rights "by extending an investigatory encounter based on suspicion that [appellee] posed a threat to himself or to the public safety due to his physical or mental condition." Appellants' Br. at 8. According to appellants, even though both officers admit that they did not possess a reasonable suspicion of criminal wrongdoing when they initially approached appellee's vehicle, they were nevertheless justified in detaining appellee under the officers' "community caretaking" function, in order to investigate appellee's physical and mental condition and competence to operate his motor vehicle. Id. at 8-10. Appellee disagrees, arguing that the trial court properly found that the officers were required to end the encounter and simply withdraw and survey, absent a reasonable suspicion of criminal wrongdoing,[7] once appellee refused to answer any questions. Appellee's Br. at 8-9.

The Supreme Court discussed the community caretaking functions of police officers in Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). In Cady, the Supreme

---

[6] One of the physicians at the emergency room indicated that appellee "cannot be taken to the county prison in this wild combative state." App. at 142.

[7] In Terry v. Ohio, 392 U.S. 1, 20-22 (1968), the Supreme Court recognized that effective crime prevention and detection requires that an officer be allowed to detain individuals briefly even though there is no probable cause to arrest them. To justify those brief detentions, the officer must have a reasonable suspicion that criminal activity is afoot. Id. at 30. In this context, the Fourth Amendment requires only some minimal level of objective justification for the officer's actions, measured in light of the totality of the circumstances. See United States v. Sokolow, 490 U.S. 1, 7-8 (1989).

Court held that a search of a trunk of a disabled car was not unreasonable under the Fourth and Fourteenth Amendments, even though the local police officer conducting the search had not previously obtained a search warrant. Cady, 413 U.S. at 446. In so holding, the Court explained that local police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441. The Court further stated that "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." Id. at 447. The Eighth Circuit has recognized the existence of this community caretaking function. See United States v. Smith, 162 F.3d 1226, 1226 (8th Cir. 1998) (citing Cady, 413 U.S. at 441; United States v. King, 990 F.2d 1552, 1560-61 (10th Cir. 1993)).

In United States v. King, 990 F.2d at 1560, the Tenth Circuit applied the Supreme Court's reasoning in Cady to the seizure of an individual. The Tenth Circuit noted that "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" Id. at 1560 (quoting Cady, 413 U.S. at 441). The King court further explained that "[i]n the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person . . . in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." Id. (citing United States v. Rideau, 949 F.2d 718, 720 (5th Cir. 1991), *reversed on other grounds* 969 F.2d 1572 (5th Cir. 1992)).

In the case of United States v. Rideau, the Fifth Circuit also adopted the community caretaking analysis. Rideau, 949 F.2d at 720. In that case, police officers asked for identification from an individual after they observed him stumble as he stepped from the road. Id. at 719. The individual, later identified as defendant Rideau, was wearing dark clothing and was standing in the road at about 10:30 p.m. Id. The Fifth Circuit held that the officers were justified in detaining Rideau, even without suspicion of criminal activity, noting that "local police engage in 'community

7

caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Id. at 720 (quoting Cady, 413 U.S. at 441).[8] The Fifth Circuit, on rehearing, explained, "Terry recognizes that '[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.'" United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir. 1992) (quoting Terry, 392 U.S. at 13).

The Court finds that the reasoning set forth in King and Rideau is sound. King, 990 F.2d at 1560; Rideau, 949 F.2d at 720. In the instant case, the appellee argues that the police officers were required simply to walk away from appellee's vehicle, thus

---

[8] In Rideau, the Fifth Circuit also relied on the ABA Standards for Criminal Justice, Standard § 1-2.2 at 31-32 (2d ed.1980), which states that "officers must 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.'" Rideau, 949 F.2d at 720. The court further noted:

> Reading Terry's language narrowly, Rideau argues that officers cannot detain an individual unless they suspect him of being involved in some sort of criminal activity. We refuse to give Terry such a cramped interpretation. Terry held that an officer may briefly detain an individual whom he suspects is involved in criminal activity. It did not exclude the possibility that an officer may stop an individual for other reasons consistent with the Fourth Amendment. Indeed, the opinion states that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which . . . reasonably warrant [an] intrusion" into the individual's liberty. [Terry,] 392 U.S. at 21, 88 S.Ct. at 1880. Terry focused on the officer's suspicion that the defendant was involved in criminal activity only because that was the justification the officer gave for the detention.

Rideau, 949 F.2d at 720.

perhaps permitting a possibly intoxicated individual to drive the vehicle,[9] potentially harming himself and other citizens. The Court simply cannot conclude that the strictures of <u>Terry</u> and its progeny compel such a result.[10] Like the officers in <u>Rideau</u>, this Court finds that Officers Adams and Prahm "would have been derelict in their duties" had they not detained appellee Winters. <u>Rideau</u>, 949 F.2d at 720. Accordingly, this Court reverses the district court on this issue.

## B. Excessive Force Claim

Appellants also argue that the district court erred in ruling that Officer Adams used excessive force when he struck appellee in the right eye with his closed fist during the struggle inside of the vehicle. Appellants contend that "a single blow struck with a fist during violent resistance by an unrestrained subject does not rise to the level of excessive force under the Fourth Amendment." Appellants' Br. at 18. Appellants argue that the trial court placed too much emphasis on the admission by appellant Adams that he had, on a prior occasion, "lost control and punched another arrestee in

---

[9] Although the appellee argues that the vehicle was immobilized, the officers could have reasonably determined that appellee was lying when he stated that he was waiting for a push start. Additionally, the record contains evidence which suggests that the keys were in the ignition.

[10] Although the appellants failed to argue this point in their brief, the Court also finds that the officers likely had reasonable suspicion to detain appellee and request his identification. Although an informant's anonymous tip, standing alone, is insufficient to establish reasonable suspicion (see <u>Florida v. J.L.</u>, 529 U.S. 266, 274 (2000); <u>United States v. Wells</u>, 223 F.3d 835, 839 (8th Cir. 2000)), the evidence suggests that both Officers Adams and Prahm also observed the appellee exhibiting erratic behavior indicative of intoxication from ingestion of a controlled substance. Additionally, appellee's presence in a parked car on a dead-end street in a purely residential neighborhood at 11:30 p.m. might also have contributed to a finding of reasonable suspicion. See <u>Adams v. Williams</u>, 407 U.S. 143, 147-48 (1972) (holding that surrounding circumstances are relevant in determining whether the requisite suspicion exists to warrant further investigation).

the face." Id. at 21. Thus, appellants, contend that the trial court improperly employed a subjective standard, rather than the objective reasonableness standard set forth in Graham v. Connor, 490 U.S. 386, 397 (1989), in determining whether Adams employed excessive force. Appellants' Br. at 22.

Appellee contends that a punch to the face is always excessive force, unless the officer is acting in self-defense. Appellee's Br. at 11. Appellee argues that Adams's punch was also impermissible because appellee had not been charged with a crime at the time of the punch and "the officers could have placed themselves in safety at any time by withdrawing from the vehicle." Id. at 12.

The Court holds that the district court erred in finding that appellant Adams used excessive force in this instance. All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment. Graham, 490 U.S. at 388. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.[11] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Id. at 396-97. In making an assessment of objective reasonableness, the Supreme Court stated that certain factors should be balanced, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

---

[11] In Graham, the Court explained that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397.

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

A review of the facts at issue reveals that appellant Adams's actions were objectively reasonable in light of the surrounding circumstances. The evidence demonstrates that appellee Winters was behaving quite erratically both before and after Lieutenant Richard Jensen broke the passenger window and Adams and Prahm attempted to remove appellee from the vehicle. The district court specifically found that appellee was kicking and flailing at the officers in an attempt to prevent the officers from removing him from the car. The district court also found that appellee struck appellant Adams in the face prior to being struck himself. Further, when appellee was taken to the hospital, he continued to act in an unresponsive and violent manner and had to be restrained in leather straps at the hospital for several hours for the protection of the staff. Appellee was diagnosed with "methamphetamine intoxication." Under the totality of the circumstances, the Court finds that Adams's single blow to appellee's eye was objectively reasonable. Thus, this Court reverses the district court's ruling on this issue.

### C. Qualified Immunity

Even if the appellants had violated the appellee's Fourth Amendment rights by unreasonably detaining him or by employing excessive force, this Court holds that the officers are nevertheless entitled to qualified immunity for their actions. We review de novo the legal issue relating to the existence of qualified immunity. Guite v. Wright, 147 F.3d 747, 749 (8th Cir. 1998). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

11

The determination of whether an officer is entitled to qualified immunity requires consideration of the "objective legal reasonableness" of the officer's conduct in light of the information he possessed at the time of the alleged violation. Id. at 819. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded" that the defendant should have taken the disputed action. Malley v. Briggs, 475 U.S. 335, 341 (1986). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id.

Even if this Court had determined that the appellants were not permitted to detain appellee under the community caretaking function, the Court finds that the appellants were reasonable in their beliefs that this duty permitted them to briefly detain and investigate the identity and circumstances of appellee. As discussed earlier in this opinion, the availability of the community caretaking function as an alternative to reasonable suspicion under Terry v. Ohio is still a subject of debate in the courts. Thus, the appellants' conduct cannot be found to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow, 457 U.S. at 818, and the appellants are therefore entitled to qualified immunity on the Fourth Amendment illegal detention claim.

Additionally, the Court finds that appellant Adams is entitled to qualified immunity on the excessive force claim. "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person," Guite, 147 F.3d at 750, "and the test is whether the amount of force used was objectively reasonable under the particular circumstances." Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). This Court finds it incredulous that "no reasonably competent officer" would have concluded that appellant Adams was justified in striking appellee in the eye during the fracas in the vehicle. Accordingly, the Court reverses the district court's ruling on the issue of qualified immunity.

## III. CONCLUSION

The Court finds that the trial court erred in determining that the appellants violated appellee's Fourth Amendment rights by detaining him for investigatory purposes. Further, the trial court erred in determining that appellant Adams used excessive force in striking appellee Winters in the eye with a closed fist during a resisted attempt to remove appellee from his vehicle. With regard to both issues, this Court also holds that the officers were entitled to qualified immunity. Thus, the Court hereby reverses the district court's ruling and dismisses appellee's complaint in its entirety.

BYE, Circuit Judge, concurring in the judgment.

Though I disagree with much of the majority's reasoning, I respectfully concur in the judgment of the court.

The majority correctly holds that police officers must exercise a community caretaking function, as described in United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993). However, as the King court noted, there are limits on the exercise of this function, as with any police function:

> [A] person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for "[i]t is surely anomalous to say that the individual. . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." [Camara v. Municipal Court, 387 U.S. 523, 530 (1967)]. . . . Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference.

Id.

Officers Adams and Prahm argue that they reasonably believed that Winters posed a danger to himself and others due to his erratic behavior. According to the district court's findings of fact, however, nearly all of Winters's erratic behavior surfaced when the officers persisted in their efforts to communicate with him and began their efforts to gain entry into his car. The district court concluded that, at the time Winters asked to be left alone, "Adams had no justification either to arrest Winters or to force his way into Winters's vehicle. Nevertheless, Adams, and later Prahm, continued their efforts to identify Winters and to persuade him to get out of the car."

We must accept a district court's findings of fact unless we determine that they are clearly erroneous. See Milligan v. City of Red Oak, Ia., 230 F.3d 355, 359 (8th Cir. 2000) (stating standard of review). I do not believe the district court erred in describing the chronology of Winters's increasingly erratic behavior. Nor does the majority state that the district court's findings of fact on this point are clearly erroneous. Nevertheless, the majority would find that Adams and Prahm were justified in continuing to pester Winters, and in attempting to break into his car. In my opinion, the officers' actions, which were not based on "specific articulable facts," King, 990 F.2d at 1560, were unreasonable. I would affirm the district court on the illegal seizure question.

I also disagree with the majority's reason for granting qualified immunity for the illegal seizure claim (part II-C). Specifically, I disagree with the majority's view that the law on community caretaking is not clearly established. As we recently noted, "[o]ur circuit subscribes to a 'broad view' of what constitutes clearly established law; '[i]n the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts.'" Tlamka v. Serrell, 244 F.3d 628, 634 (8th Cir. 2001) (quoting Buckley v. Rogerson, 133 F.3d

14

1125, 1129 (8th Cir. 1998)). I believe that the law concerning the community caretaking function and its limitations was clearly established in <u>King</u> and other circuit decisions.

That said, I believe that the officers are entitled to qualified immunity. The facts of this case present a close call. There is, in my opinion, a fine line between the officers' conduct that did not violate Winters's Fourth Amendment rights and their conduct that did violate his rights. In the end, I do not believe the officers knowingly crossed that line, see <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986), and therefore I agree they are entitled to qualified immunity.[12]

---

[12]I question, however, why we are considering qualified immunity at all at this stage in the proceedings. The officers did not raise qualified immunity as a defense until trial. Qualified immunity is an immunity from suit, rather than a defense to liability. <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 527 (1985). As such, it should be decided by a motion to dismiss or for summary judgment prior to discovery. <u>Id.</u> The Fifth Circuit has determined that a failure to raise qualified immunity prior to trial does not constitute a waiver of the qualified immunity defense. <u>Spann v. Rainey</u>, 987 F.2d 1110, 1114 (5th Cir. 1993). But when qualified immunity is discussed alongside the merits, the two become confused, and the power of the qualified immunity defense is diluted.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.