IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 24, 2018 Session

**STATE OF TENNESSEE v. JOHN D. HENRY**

**Appeal from the Criminal Court for Knox County**
No. 107467   Steven Wayne Sword, Judge
_____

**No. E2017-01989-CCA-R3-CD**
_____

The Appellant, John D. Henry, was convicted in the Knox County Criminal Court of driving under the influence (DUI) per se, fifth offense, and driving on a revoked license and received an effective two-year sentence to be served as 150 days in jail with the remainder to be served on supervised probation.  On appeal, the Appellant contends that the trial court erred by refusing to grant his motions to suppress evidence because his warrantless stop did not fall under the exigent circumstances exception to the warrant requirement and because he did not voluntarily consent to his warrantless blood draw. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Robert W. White, Maryville, Tennessee, for the appellant, John D. Henry.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joe Welker and Jordan Murray, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In March 2016, the Knox County Grand Jury indicted the Appellant as follows: count one, DUI per se; count two, DUI; count three, driving on a revoked license; count four, DUI per se, fifth offense; and count five, DUI, fifth offense.  In June 2016, the Appellant filed two motions to suppress evidence.  In the first motion, he claimed that

police officers unlawfully seized him without a warrant. In the second motion, he contended that the officers unlawfully obtained his blood sample.

At the January 2017 hearing on the motions to suppress, Officer Jeff Damewood of the Knoxville Police Department (KPD) testified that on the afternoon of September 20, 2014, he and Officer Adam Barnett were dispatched to "a suspicious person or maybe a sick person call" at a liquor store on West Young High Pike. The State played the call to the KPD for the trial court. At the outset of the call, the caller asked, "Is this the non-emergency line?" The dispatcher said yes, and the caller said, "Okay, I just wanted to make sure I wasn't calling something I didn't need to be." The caller identified himself as "Justin," stated that he was an employee at Southland Spirits and Wine, and said that "we have a guy that is passed out in his car back here next to our dumpster." The caller said the car was a silver Chevrolet Cavalier and reported the car's license plate number. He described the man in the car as an "older white gentlemen" wearing a hat and a lime-green shirt.

Officer Damewood testified that he arrived at the scene just prior to Officer Barnett and that he spoke with the caller and another store employee. Officer Damewood saw the car "parked at the end of the building and near the dumpster" and saw the Appellant walking from the back of the building to the Cavalier. The Appellant got into the driver's side. Officer Damewood said that Officer Barnett arrived and that "we proceeded with the stop."

On cross-examination, Officer Damewood acknowledged that he and Officer Barnett were dispatched to the scene at 5:32 p.m. and that they arrived about eleven minutes later. He and Officer Barnett approached the Cavalier at the same time, but Officer Barnett initiated the conversation with the Appellant and "handled most of this situation." Although the caller had reported that a person was "'passed out'" in the car, the Appellant obviously was not passed out when Officer Damewood saw him walking to the Cavalier. Officer Damewood acknowledged that he never saw the Appellant passed out and that he did not notice anything unusual about the Appellant's gait. He said, though, that he saw the Appellant walk "a short distance."

Officer Adam Barnett of the KPD testified that about 5:30 p.m. on September 20, 2014, he and Officer Damewood were dispatched "to a 911 call at the liquor store of a male passed out and a vehicle." When they arrived at the scene, Officer Damewood spoke with "the people who called." The officers then made contact with the Appellant, and Officer Barnett told the Appellant why they were there. Officer Barnett said that he smelled a strong odor of alcohol on the Appellant's person and that he saw beer cans in plain view in the car. He did not recall if the cans were empty or full.

Officer Barnett testified that he had the Appellant perform field sobriety tests and that the Appellant performed "[p]oorly" on the tests. Officer Barnett and the Appellant discussed a blood test, and the Appellant agreed to give blood. Officer Barnett read an implied consent form to the Appellant, and the Appellant again agreed to a blood draw.

On cross-examination, Officer Barnett testified that he and Officer Damewood arrived at the liquor store at the same time but that his patrol car was behind Officer Damewood's patrol car. The Appellant got into the Cavalier and turned on the engine as the officers pulled into the parking lot. The Appellant was sitting in the driver's seat of the Cavalier when Officer Barnett approached the car, and Officer Barnett "asked him to shut the vehicle off." Officer Barnett said he did so "for safety standpoint." The Appellant was not passed out in the car, did not appear to be sick, and turned off the engine as requested.

Officer Barnett testified that two beer cans were on the passenger side of the car and that he saw the cans "probably" within thirty seconds of telling the Appellant to turn off the engine. One can was in a bag on the passenger seat, but Officer Barnett did not remember where the second can was located. The officers later found amber-colored pill bottles in the car.

Officer Barnett testified that he arrested the Appellant and read an implied consent form to him. The Appellant consented to a blood draw, so he drove the Appellant to a hospital for the draw. En route, the Appellant revoked his consent. Officer Barnett said that he informed the Appellant "of the new mandatory blood draw law" and that "we would get a search warrant" for the blood. He also told the Appellant that the Appellant would receive "a new charge" for violating the implied consent law. At that point, the Appellant again agreed to the blood draw.

The trial court asked Officer Barnett, "Officer, the basis for the mandatory blood draw, in your opinion was what?" Officer Barnett answered, "The fact that his license had been revoked for DUI, sir." The trial court then asked, "So you felt like the law required that you take blood from him [whether he consented or not]?" Officer Barnett answered, "Yes, sir."

At the conclusion of the hearing, the parties introduced a video of the Appellant's stop, recorded from Officer Barnett's patrol car, into evidence.[1] However, neither party played the video for the trial court during the suppression hearing.

---

[1] In its order denying the motions to suppress, the trial court stated that "the defendant initially agreed to a blood test. It is not clear what was said at the hospital. The copy of the cruiser video presented to the court contains no working audio at the hospital." We have reviewed the video. The

In a written order, the trial court denied the motions to suppress. First, the court addressed the officers' warrantless seizure of the Appellant and found that the Appellant was seized when Officer Barnett told him to turn off the car's engine. However, the court determined that the community caretaking exception to the warrant requirement existed in this case because "the officers were responding to a third party report of a person passed out in a car" and because "[s]uch a report puts an affirmative duty on a law enforcement officer to investigate to determine if someone was in need of medical assistance." In support of the trial court's conclusion, the court noted, "It is common knowledge that officers are having to provide life-saving assistance to individuals who have overdosed on opiates multiple times a week in Knoxville." The court stated that although the officers saw the Appellant "walking on his own" when they arrived at the scene, which was "contrary to the initial report," it was reasonable for them to approach him, talk with him briefly to determine if he needed assistance, and prevent him from leaving the scene until they could make that determination. The court stated that the initial detention was minimal in that the officers only told the Appellant to turn off the car's engine, did not get him out of the car, and did not touch him. The court found that within thirty seconds of talking with the Appellant, the officers noticed an odor of alcohol coming from his person and saw beer cans in the car. The court concluded that at that point, the officers had reasonable suspicion that the Appellant was committing DUI and could detain him further to investigate their suspicions.

As to the Appellant's warrantless blood draw, the trial court found that the Appellant initially consented to the blood draw, withdrew his consent, and then changed his mind again and agreed to the blood test. The court concluded that the Appellant's blood "was validly obtained pursuant to implied consent" and, therefore, that there was no need for the court to determine whether he expressly consented to the blood draw.

After the trial court denied the Appellant's motions to suppress, the Appellant proceeded to trial. At the July 2017 bench trial, Officer Barnett testified that about 5:30 p.m. on September 20, 2014, he was dispatched to an address on West Young High Pike. He said that according to the call, "there was a possibly a person passed out in a vehicle." The State again played the call for the trial court.

Officer Barnett testified that he and his partner, Officer Damewood, arrived at the location and saw the Chevrolet Cavalier reported in the call. They got out of their patrol cars, approached the Cavalier, and made contact with the Appellant, who was sitting in

video recorded the incident from the time Officers Barnett and Damewood approached the Cavalier in the liquor store parking lot until Officer Barnett and the Appellant entered the hospital.

- 4 -

the driver's seat. The Cavalier's engine was on, so Officer Barnett asked the Appellant to turn off the engine. He said he did so for "[o]fficer safety."

Officer Barnett testified that while he was speaking with the Appellant, he noticed a strong odor of alcohol coming from the Appellant's person, that the Appellant's speech was "slightly slurred," and that a couple of beer cans were on the passenger seat. Officer Barnett also noticed the Appellant was wearing a hat that said "'moonshine'" on it. Officer Barnett asked the Appellant what he was doing there, and the Appellant told Officer Barnett that "he was out driving around, and he got out to pee." Officer Barnett asked if the Appellant had consumed any alcohol, and the Appellant said he had consumed alcohol the previous night. Officer Barnett asked to search the Cavalier, and the Appellant consented to a search of the car. During the search, the officers found empty pill bottles, including a bottle for oxycodone, on the back seat. The Appellant claimed the pills were for his blood pressure. The officers also found two empty beer cans on the front passenger seat.

Officer Barnett testified that based on the empty pill bottles, the smell of alcohol, and the Appellant's slightly slurred speech, he decided to conduct field sobriety tests "for the safety of the defendant and the public . . . to make sure that he could drive if possible." The Appellant agreed to take the tests, so Officer Barnett administered the horizontal gaze nystagmus (HGN), the walk-and-turn, and the one-leg stand tests to him. Prior to the tests, Officer Barnett asked if the Appellant had any health conditions that would prohibit him from completing the tests, and the Appellant said he had been shot in Afghanistan during Desert Storm. Officer Barnett said the Appellant performed "[p]oorly" on the walk-and-turn test in that the Appellant began the test too soon, took the wrong number of steps, made an improper turn, and "was not heel to toe." On the one-leg stand test, the Appellant put his foot down multiple times, raised his hands, and stopped the test after twenty seconds. After the field sobriety tests, Officer Barnett asked the Appellant to recite the alphabet, starting with letter D and ending with letter P, and the Appellant skipped letter E.

Officer Barnett testified that he arrested the Appellant for DUI and that a records check showed the Appellant's driver's license had been revoked. Officer Barnett advised the Appellant of his Miranda rights and read an implied consent form to him. After Officer Barnett read the form, the Appellant stated, "[L]et's go do a blood draw to prove you wrong." Officer Barnett drove the Appellant to a hospital, and a nurse drew the Appellant's blood. Officer Barnett identified the Appellant's "Official Alcohol Report" from the Tennessee Bureau of Investigation (TBI). According to the report, the nurse obtained the Appellant's blood sample at 6:55 p.m., and the ethyl alcohol content of his blood was .201 gram percent.

The State played a redacted version of the video from Officer Barnett's patrol car for the trial court.[2] After the State played the video, Officer Barnett acknowledged that at the time of the Appellant's arrest, he was "under the impression" that a blood draw was mandatory if a suspect had prior DUI convictions. The State also introduced into evidence a certified copy of the Appellant's driving record, showing the Appellant's previous DUI convictions.

On cross-examination, Officer Barnett testified that when he and Officer Damewood first arrived on the scene, the Appellant was "walking up" to the Cavalier. By the time Officer Barnett approached the car, the Appellant was sitting in the driver's seat. Officer Barnett said that the engine was "running" and that he told the Appellant to turn off the engine "for officer safety and [the] safety of anybody around."

At the conclusion of Officer Barnett's testimony, the State rested its case, and the trial court found the Appellant guilty of all five counts. The trial court merged the DUI convictions into the conviction of DUI per se, fifth offense, and ordered that the Appellant serve concurrent sentences of two years for the DUI per se conviction, a Class E felony, and eleven months, twenty-nine days for the conviction of driving on a revoked license, a Class B misdemeanor. The trial court ordered that the Appellant serve the effective sentence as 150 days in jail followed by supervised probation.

## II. Analysis

The Appellant challenges the trial court's denial of his motions to suppress. In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

---

[2] The State advised the trial court that it redacted references to the Appellant's prior DUI convictions and "the conversation if you don't give blood, the officer has to take it" from the video.

## A. Warrantless Stop

The Appellant claims that the trial court erred by failing to grant his motion to suppress evidence obtained as a result of his warrantless stop because he was seized when Officer Barnett told him to turn off the car's engine and because the officers detained him without reasonable suspicion or probable cause. In a related argument, he contends that the trial court erred by considering the KPD's recorded call, played by the State at the suppression hearing and at trial, in its analysis. The State concedes that the Appellant was seized when Officer Barnett asked him to turn off the car but argues that this case is a "quintessential" example of the community caretaking exception to the warrant requirement. The State also argues that the Appellant has waived his hearsay claim regarding the recorded call and that, in any event, the recording was not hearsay. We agree with the State.

First, we will address the recorded call. During Officer Damewood's testimony at the suppression hearing, the State advised the trial court that it wanted to play the KPD's recorded call for the court. Defense counsel objected on the basis that someone from the KPD's call center needed to authenticate the call. The trial court stated that it was not concerned about authenticating the recording but that "[t]he bigger concern is hearsay." The trial court ruled that the recording was not hearsay because the court was going to admit the call into evidence to show why Officer Damewood went to the liquor store, not for the call's truth. Defense counsel responded, "Well, if the Court's not -- if the Court's not receiving it for the purpose of reasonable suspicion and/or probable cause, then I have no objection." Before Officer Barnett testified at trial, defense counsel noted his objection to the recording at the suppression hearing. Defense counsel then stated that "I don't want to waive anything" but that "for the purposes of this proceeding I have no objection." When the State played the recording for the trial court, the court said, "Again, the Court's not considering it for the truth of the matter asserted, but for the effect on the listener."

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. Our supreme court has held that a trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id.

We agree with the State that the Appellant has waived this issue. When the State requested to play the recording at the suppression hearing, it was the trial court, not the Appellant, that initially expressed a hearsay concern. Even then, the Appellant failed to make a contemporaneous hearsay objection or any argument regarding hearsay. See Tenn. R. Evid. 103(a); Tenn. R. App. P. 36(a). Regardless, the trial court stated at the suppression hearing and at trial that it was admitting the call into evidence to show why the officers went to the liquor store, not for the recording's truth. In other words, the call was not admitted to show that the Appellant was passed out in the car. See State v. Eric Milon, No. W2016-01707-CCA-R3-CD, 2017 WL 4739527, at *4 (Tenn. Crim. App. Oct. 19, 2017) (officer's testimony about anonymous 911 call, reporting that defendant was arguing on the street and armed with a weapon, was not hearsay because it was offered to show why officer approached defendant, not to show defendant was armed). Therefore, we agree with the trial court that the recording was not hearsay.

As to the Appellant's warrantless stop, the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998).

"Of course, the warrant requirements of the federal and state constitutions are implicated only when a search or seizure actually occurs, and not every police-citizen interaction results in a search or seizure." State v. McCormick, 494 S.W.3d 673, 679 (Tenn. 2016). Our courts have articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted).

An "officer may approach an individual in a public place and ask questions without implicating constitutional protections" even when there is no basis for suspecting criminal activity. State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000). "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" Id. at 424 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In other words, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave."

Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 426.

"Reasonable suspicion" for a detention is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas v. United States, 517 U.S. 690, 696 (1996)). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

Turning to the instant case, a person, sitting in his or her car with the engine running, would not feel free to leave if approached by a police officer and instructed by the officer to turn off the engine. Therefore, we agree with the Appellant, the State, and the trial court that the Appellant was seized when Officer Barnett told him to turn off the engine. Next, we consider whether the community caretaking exception to the warrant requirement applied to the seizure.

Previously, our supreme court limited the community caretaking doctrine to consensual police-citizen encounters in which probable cause or reasonable suspicion was not required. State v. Moats, 403 S.W.3d 170, 182 (Tenn. 2013). However, eight months before the Appellant's hearing on his motions to suppress evidence, our supreme court reconsidered whether the community caretaking doctrine was an exception to the warrant requirement. In McCormick, a police officer was on routine patrol in the early morning hours when he observed a vehicle partially in the roadway and partially blocking a closed shopping center. 494 S.W.3d at 676. The vehicle's headlights were on, and it's engine was running. Id. The officer approached the driver's door to conduct a "'welfare check'" and saw the defendant slumped over the wheel. Id. After the officer tried unsuccessfully to rouse the defendant by tapping on the window, he opened the door and noticed a strong odor of alcohol emanating from the defendant's breath and person. Id.

The officer ultimately had the defendant perform field sobriety tests and arrested him for DUI, and the defendant filed a motion to suppress on the basis that the officer's warrantless seizure of his vehicle and the ensuing field sobriety tests were not supported by reasonable suspicion. Id. at 676-77, 675.

Our supreme court held that the community caretaking doctrine was an exception to the warrant requirement. Id. at 684. Further, the court formulated the following test for determining whether the exception applies in a case:

> [T]he community caretaking exception will justify a warrantless seizure so long as
>
>> the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.
>
> Moats, 403 S.W.3d at 195 (Tenn. 2016)] (Clark and Koch, JJ., dissenting); see also [State v. Kramer, 759 N.W.2d 598, 608 [(Wis. 2009)]. "Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case[,]" including "the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance other than the officer, and the risk of danger if the officer provides no assistance." Moats, 403 S.W.3d at 195-96 (Clark and Koch, JJ., dissenting) (citing [Salinas v. State, 224 S.W.3d 752, 756 (Tex. Ct. App. 2007)]; [State v. Pinkard, 785 N.W.2d 592, 605 (Wis. 2010)]). We emphasize that when the community caretaking exception is invoked to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse. [State v. Smathers, 753 S.E.2d 380, 386 (N.C. Ct. App. 2014)].

Id. at 687.

The Appellant contends that the facts of this case are distinguishable from McCormick in that when Officer Barnett first encountered him, he was walking to the Cavalier and did not appear to be in peril or in need of assistance. He argues that this

- 10 -

case is more akin to State v. Deborah Jean Weston, No. E2015-01530-CCA-R3-CD, 2016 WL 4132543 (Tenn. Crim. App. at Knoxville, Aug. 2, 2016). In that case, a police officer was stopped at a red light and saw a motorist, also stopped at the light, get out of his truck and look at the back of his truck. Deborah Jean Weston, No. E2015-01530-CCA-R3-CD, 2016 WL 4132543, at *1. The motorist then walked to the defendant's driver's side window and talked with her. Id. Believing that the motorist and the defendant had been in an accident, the officer turned on his blue lights and pulled in behind the defendant's vehicle. Id. at *2. By that time, though, the motorist had returned to his truck, and both he and the defendant had started moving forward. Id. Shortly thereafter, the officer stopped both vehicles and noticed an odor of alcohol about the defendant's person. Id. In the State's appeal of the trial court's granting the defendant's motion to suppress, this court held that the facts of the case did not support an application of the community caretaking exception to the warrant requirement, explaining,

> The seizure of the defendant occurred some time after and some distance away from the initial incident that caused Officer Porter to activate his blue lights in the first place. Nothing in the record suggests that the defendant exhibited any "level of distress" or that either driver otherwise indicated any need for the officer's assistance. Additionally, the evidence suggested no "risk of danger" or "threat to public safety" had Officer Porter decided not to intervene. Indeed, both drivers had driven away from the scene initially observed by Officer Porter with no damage to either vehicle.

Id. at *4.

In the present case, the video from Officer Barnett's patrol car shows that Officer Barnett approached the Cavalier, told the Appellant to turn off the car, and asked him, "What's going on?" The Appellant said he was just getting something to eat, and Officer Barnett told him, "We got a call you were passed out in the car." The Appellant told him that he was "taking a pee," and Officer Barnett asked him in a surprised voice, "You peed outside?" Officer Barnett asked to see the Appellant's driver's license and told him to stay in the vehicle. Twenty-five seconds later, Officer Barnett asked the Appellant if he had had anything to drink, and the Appellant answered, "Last night." Officer Barnett then asked him, "What's that beer over there in the seat?" The Appellant told him that it was "garbage" from the previous night. Officer Barnett had the Appellant get out of the car and perform field sobriety tests.

Unlike the facts in both McCormick and Deborah Jean Watson, the officers in this case did not just happen upon the Appellant but were responding to a call about a man passed out in a car behind a business. Moreover, the business was not just any business but a liquor store. We note that at oral argument, defense counsel strongly protested this

- 11 -

court's consideration of that fact in our analysis. However, McCormick directs that courts "meticulously" consider the facts of each case in order to determine whether the community caretaking exception applies to a seizure. Upon arriving at the scene, Officer Damewood spoke with the liquor store employee who had made the call. Officer Damewood and Officer Barnett then went behind the building and saw the Appellant, who matched the description given by the employee, and the car, which also matched the description given by the employee. The Appellant walked to the car and sat in the driver's seat. Although the officers did not notice anything unusual about the Appellant's gait as he walked, the officers saw him walk only a short distance. The officers approached the car and noticed the engine was on, and Officer Barnett told the Appellant to turn off the car.

We believe the record supports the trial court's determination that the officers possessed specific and articulable facts to conclude that a community caretaking function was appropriate in this case. To hold otherwise would mean that the officers, having only seen the Appellant walk to the Cavalier, would have been "required simply to walk away from [the Appellant's] vehicle, thus perhaps permitting a possibly intoxicated individual to drive the vehicle, potentially harming himself and other citizens." Winters v. Adams, 254 F.3d 758, 764 (8th Cir. 2001). Thus, we conclude that under the facts of this case, the officers could briefly detain and question the Appellant to assess his condition. Within just thirty seconds of conversing with the Appellant, Officer Barnett noticed an odor of alcohol coming from his breath and person, that his speech was slurred, and that beer cans were on the passenger seat. Therefore, by the time Officer Barnett had the Appellant get out of the car and perform the field sobriety tests, he had reasonable suspicion that the Appellant had committed or was about to commit DUI. See McCormick, 494 S.W.3d at 689. Accordingly, we conclude that the officers' brief initial detention of the Appellant was justified by the community caretaking exception to the warrant requirement and that their continued detention of the Appellant was based on reasonable suspicion. See id.

## B. Implied Consent

The Appellant contends that the trial court erred by denying his motion to suppress his blood test results because he revoked his initial consent to the blood draw and, even if he later gave consent, did not do so voluntarily. The State concedes that the trial court erred by finding that the Appellant consented to the blood draw pursuant to the implied consent statute but argues that he gave actual consent. We agree with the State.

A case involving the collection of a blood sample is a search and seizure case subject to the constitutional limitations of the Fourth Amendment and Article I, Section 7 of the Tennessee Constitution, which protect against unreasonable searches and seizures.

See Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016); State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006). "An accused's blood cannot be taken or analyzed unless the search is reasonable pursuant to the Fourth Amendment." State v. Henry, 539 S.W.3d 223, 234 (Tenn. Crim. App. 2017) (citing Birchfield, 136 S. Ct. at 2173).

At the time of the Appellant's blood draw, the implied consent statute provided as follows:

> Any person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests. However, no such test or tests may be administered pursuant to this section unless conducted at the direction of a law enforcement officer having reasonable grounds to believe the person was driving while under the influence of alcohol, a drug, any other intoxicant or any combination of alcohol, drugs, or other intoxicants as prohibited by § 55-10-401, or was violating § 39-13-106, § 39-13-213(a)(2) or § 39-13-218.

Tenn. Code Ann. § 55-10-406(a) (Supp. 2014). Thus, the statute allowed a police officer to test a motorist's blood when the officer had "reasonable grounds to believe" that the motorist was driving while under the influence or had committed vehicular assault, vehicular homicide as a proximate result of the driver's intoxication, or aggravated vehicular homicide as a proximate result of intoxication. Tenn. Code Ann. § 55-10-406(a) (Supp. 2014). "Reasonable grounds" has been interpreted to mean "probable cause." Henry, 539 S.W.3d at 237 (citing State v. Reynolds, 504 S.W.3d 283, 295 n.11 (Tenn. 2016)).

Before conducting the blood test, though, the officer must inform the motorist that the motorist's refusal to submit to the test will result in the suspension by the court of the motorist's license. Tenn. Code Ann. § 55-10-406(c) (Supp. 2014). If the motorist is advised of the consequences of refusal and refuses to submit to the blood test, the test is not to be given and the motorist is to be charged with violating the implied consent law. Tenn. Code Ann. § 55-10-406(d)(1) (Supp. 2014).

In certain circumstances, the blood draw is mandatory. See Tenn. Code Ann. § 55-10-406(d)(5) (Supp. 2014). One of those circumstances is, as in this case, the motorist's having a prior DUI conviction. Specifically, if the police officer has probable cause to believe that the motorist has a prior conviction of DUI, then

the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

Tenn. Code Ann. § 55-10-406(d)(5)(B) (Supp. 2014).

Turning to the instant case, the video shows that after Officer Barnett administered the field sobriety tests to the Appellant, the Appellant offered to give a blood sample. Officer Barnett put the Appellant into the back of his patrol car and said he was going to read an implied consent form to the Appellant. The Appellant responded, "I don't need to hear about it." Officer Barnett read the form aloud anyway. After reading the form, Officer Barnett asked, "Are you going to give blood?" The Appellant answered, "Yeah I'm going to give blood. I'm going to prove you wrong." Officer Barnett then transported the Appellant to the hospital. When they arrived, Officer Barnett got the Appellant out of the patrol car, and the Appellant asked what they were doing there. Officer Barnett told him, "I thought you agreed to give blood?" Officer Barnett asked if the Appellant wanted to give blood, and the Appellant said, "I really don't." Officer Barnett asked if the Appellant was refusing the blood draw, and the Appellant said, "Let's go to jail."

The trial court found that although the Appellant revoked his consent, "[he] is deemed to have given consent to this particular search under the implied consent law, not express consent." However, seven months after the trial court filed its order denying the Appellant's motions to suppress, this court held in Henry that "statutory implied consent, on its own, cannot justify warrantless breath or blood draws in Tennessee, including mandatory blood draws." 539 S.W.3d at 244. Therefore, the implied consent law is not an exception to the warrant requirement, and the trial court erred.

The State argues that despite the error, the Appellant was not entitled to suppression of the blood test results because he gave actual consent to the blood draw. The State acknowledges that although the Appellant said, "I really don't [want to give blood]" when he and Officer Barnett arrived at the hospital, "this statement coexists peacefully with the defendant's prior insistence on giving blood to prove Officer Barnett wrong. It is perfectly consistent to be willing to subject one's self to a test of some kind, while at the same time preferring that the test were not necessary at all." We disagree with the State. Officer Barnett testified at the suppression hearing that the Appellant revoked his consent, and the trial court accredited Officer Barnett's testimony. Moreover, the video confirms that the Appellant revoked his consent.

- 14 -

That said, the Appellant ultimately gave blood. Officer Barnett testified at the suppression hearing that although the Appellant revoked his consent, he then consented to the blood draw. "'The consent exception to the warrant requirement applies when a person voluntarily consents to a search.'" Henry, 539 S.W.3d at 241 (quoting Reynolds, 504 S.W.3d at 306). Therefore, we turn to whether the Appellant's consent was voluntary.

As explained in Henry,

> The State has the burden of establishing that a defendant's "'consent was, in fact, freely and voluntarily given.'" Reynolds, 504 S.W.3d at 306 (quoting [Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)]). To be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Ingram, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting [State v. Berrios, 235 S.W.3d 99, 109 (Tenn. 2007)]. A defendant's will cannot be overborne and his act of consenting must be "the product of an essentially free and unconstrained choice." [State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005)]. Whether consent to a search is voluntary is a question of fact to be determined from the totality of the circumstances. Reynolds, 504 S.W.3d at 307 (citing Schneckloth, 412 U.S. at 227; Cox, 171 S.W.3d at 184, 186); Berrios, 235 S.W.3d at 109.

> Factors to consider in determining whether consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police. Cox, 171 S.W.3d at 185. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent is voluntary. Id. (internal quotation marks omitted). Also, proof including, but not limited to, evidence regarding the defendant's physical condition and the adverse effects of medications on a defendant's judgment and reasoning may establish that a defendant lacks the capacity to voluntarily consent. Cf. Reynolds, 504 S.W.3d at 309. Finally, as particularly significant in this case, an individual's "'[k]nowledge of the right to refuse consent'" is also a factor in determining the voluntariness of consent. Id. at 307 (quoting Schneckloth v. Bustamonte, 412 U.S. at 235-47).

- 15 -

Id. at 241-42.

The video from Officer Barnett's patrol car shows that after the Appellant revoked his consent, they got back into the patrol car. The following colloquy then occurred:

Officer Barnett: When was your last DUI conviction? . . . February, right?

The Appellant: Lenoir City.

Officer Barnett: Okay. Well, I'm going to try to do you a favor here. If you don't give blood, I've got to take blood. There's a new law they passed, and it says if you have a DUI conviction, you don't have the right to say no. So why don't you give blood . . . instead of catching an extra charge?

The Appellant: An extra charge of what?

Officer Barnett: Implied consent. Violation of implied consent law.

The Appellant: It's the same stuff, though, ain't it?

Officer Barnett: It's a misdemeanor, but I'm getting your blood regardless. I'm going to have to do a search warrant and then go get it. So I'm trying to help you out here. You're going to have to give blood one way or the other with it. So if we walk in there together, they're going to take it and you're going to catch a less charge.

The Appellant: What do you mean a less charge?

Officer Barnett: Let's go give blood. I'm trying to help you out here. Trust me. I really am.

At that point, they got out of the patrol car and went into the hospital for the blood draw.

Considering the test set out in Henry, Officers Barnett and Damewood were polite and patient with the Appellant throughout their encounter with him, and they never displayed their weapons. After Officer Barnett arrested the forty-seven-year-old Appellant, who already had numerous prior convictions for DUI and was a military

- 16 -

veteran of Desert Storm, the Appellant told Officer Barnett that he did not need to hear about implied consent. Officer Barnett read an implied consent form to him anyway and advised him that refusal to take the test would result in the suspension of his driver's license. The Appellant readily agreed to the blood test. During the incident, the Appellant answered all of the officers' questions and even consented to a search of his car.

After the Appellant revoked his consent to the blood draw in the hospital parking lot, Officer Barnett told him that the blood draw was mandatory. This court has held that "a defendant's consent is not 'rendered involuntary by the threat of a mandatory blood draw' or the loss of driving privileges." State v. A.D. Smith, III, No. W2015-00133-CCA-R9-CD, 2015 WL 9177646, at *6 (Tenn. Crim. App. at Jackson, Dec. 15, 2015). Officer Barnett then told the Appellant that he would "catch an extra charge" for his refusal to submit the blood test and that the charge was a misdemeanor. Generally, a violation of the implied consent law is civil in nature. See Tenn. Code Ann. § 55-10-406(d)(1) (Supp. 2014). However, "if the driver is driving on a license that is cancelled, suspended or revoked because of a prior [DUI] conviction . . . , the refusal to submit to the test or tests will, in addition, result in a fine and mandatory jail or workhouse sentence." Tenn. Code Ann. § 55-10-406(c) (Supp. 2014). In this case, the Appellant's driving record, which the State introduced into evidence at trial, shows that the Appellant was arrested for DUI in February 2014 and that his driver's license was suspended for that DUI on August 27, 2014, less than one month before he was arrested for DUI in this case. Therefore, his refusal to submit to the blood test would have been a misdemeanor criminal offense. After Officer Barnett correctly told the Appellant that the new charge would be a misdemeanor, the Appellant did not protest the blood draw and willingly went into the hospital. The Appellant obviously knew he could refuse to take the test. Accordingly, we conclude that the Appellant voluntarily consented to having his blood drawn and that the trial court properly denied the motion to suppress the blood test results.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE